RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0089P (6th Cir.)
File Name: 03a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    v.                                    No. 01-3892

LESLIE SCOTT FOREMAN,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00145—Edmund A. Sargus, Jr., District Judge.

Argued: February 4, 2003

Decided and Filed: March 25, 2003

Before: GILMAN and GIBBONS, Circuit Judges;
POLSTER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Frederick D. Benton, Jr., Columbus, Ohio, for Appellant. Brenda S. Shoemaker, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

_____

[*] The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

---

**ON BRIEF:** Frederick D. Benton, Jr., Columbus, Ohio, for Appellant. Brenda S. Shoemaker, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. A jury found Leslie Scott Foreman guilty of bank fraud, money laundering, and uttering a counterfeit security. After denying Foreman's motion for a new trial based upon a claim of ineffective assistance of counsel, the district court sentenced him to 44 months in prison, followed by 3 years of supervised release. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

On April 27, 2000, at approximately 12:25 p.m., a man later identified as Foreman withdrew $230 from Foreman's account at the Honda Federal Credit Union through the automatic teller machine (ATM) at Miami Valley Bank in Lakeview, Ohio. The man then entered the bank and, claiming to be Jim Hunt, purchased a cashier's check in the amount of $50, payable to Scott Foreman.

Later that evening, Foreman and his wife met with a realtor concerning the purchase of a home priced at just under $340,000. To prove his ability to pay the purchase price and thereby consummate the sale, Foreman presented the realtor with a cashier's check in the amount of $500,000. The check was virtually identical—except for the amount—to the $50 cashier's check purchased earlier that day at Miami Valley Bank. Foreman asked the realtor to refund him the difference between the check and the price of the home, and they arranged to meet the next day for this purpose. The cashier's check was subsequently deposited into the escrow account of

Venture Title Agency, doing business as Amerititle, at National City Bank in Columbus, Ohio.

On April 28, 2000, Foreman met the realtor at Amerititle and received a check for the $160,081.15 difference. He then went to National City Bank and used the check to obtain $9,975 in cash and five National City Bank checks in the amounts of $10,000, $10,000, $40,000, $45,000, and $45,081.15. Foreman next traveled to Huntington National Bank in Hilliard, Ohio. He gave the bank the largest of the National City Bank checks to pay off the $21,220.86 balance on his car loan. When the bank refused to give him the difference in cash, he opened a new savings account, deposited the check, and directed that $21,220.86 be applied to his loan. He subsequently withdrew all but $718.37 of the remainder.

National City Bank presented the $500,000 check to Miami Valley Bank for payment on May 2, 2000. Miami Valley Bank quickly discovered that honoring the payment would have caused its cashier's check account to be overdrawn and, after investigating, determined that the $500,000 check was a counterfeit. On May 3, 2000, Miami Valley Bank refused payment of the counterfeit check and returned it to National City Bank, along with a copy of the $50 check upon which it was modeled. National City Bank then debited the escrow account of Amerititle for the $500,000.

Foreman gave his wife $14,000 in cash shortly after the real estate closing and told her to use it for bills and moving expenses. On May 6, 2000, three days after he learned that Miami Valley Bank had identified the cashier's check as counterfeit, Foreman went to the Fairfield Police Department to complain that "Jim Hunt" had defrauded him. He did not present the police with any documentation to back up his claim, and no police report was prepared.

**B. Procedural background**

The grand jury for the Southern District of Ohio returned a five-count indictment against Foreman in August of 2000. Count One charged him with uttering and possessing a counterfeit security on April 27, 2000, in violation of 18 U.S.C. § 513(a). The second and third counts alleged that he executed a scheme to defraud National City Bank and Miami Valley Bank, respectively, in violation of 18 U.S.C. § 1344. Count Four charged Foreman with engaging in a monetary transaction in criminally derived property, in violation of 18 U.S.C. § 1957, when he exchanged the $160,081.15 check for cash and other checks. The fifth count sought forfeiture of the house, his car, and the $160,081.15.

At the conclusion of a three-day jury trial, Foreman was convicted on the first four counts of the indictment. The government subsequently dismissed Count Five at Foreman's sentencing hearing. Foreman filed a pro se motion for a new trial one week after his conviction, claiming that he had received the ineffective assistance of counsel. Foreman's trial lawyer thereafter moved to withdraw as counsel, which motion was granted by the district court. Foreman then retained a different attorney to represent him in all subsequent proceedings. Over five days in July of 2001, the district court held a hearing on Foreman's motion for a new trial. The district court ultimately denied the motion.

Foreman then proceeded to sentencing. The district court adopted the factual findings and Sentencing Guidelines application contained in the Presentence Report, which calculated Foreman's base offense level using United States Sentencing Guidelines Manual § 2S1.2 (2000)—the Guideline for violations of 18 U.S.C. § 1957. Over Foreman's objection, the district court applied a two-level enhancement pursuant to § 2S1.2(b)(1)(B), based upon Foreman's knowledge that the funds he laundered were the proceeds of a counterfeit check. The district court then sentenced him to 44 months in prison, followed by 3 years of supervised release. This timely appeal followed.

## II.   ANALYSIS

### A.   Foreman's right to the effective assistance of counsel was not violated

Foreman maintains that he was denied his right to the effective assistance of counsel, a right guaranteed by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). This court typically declines to hear ineffective-assistance claims on direct appeal because the record is generally inadequate to evaluate such a claim. *United States v. Davis*, 306 F.3d 398, 422 (6th Cir. 2002), *cert. denied*, __ S. Ct. __, No. 02-8138, 2003 WL 398044 (U.S. Feb. 24, 2003). "If the parties have adequately developed the record, however, the court can elect to hear the issue on direct appeal." *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995).

Foreman retained new counsel after he was convicted, and then proceeded to raise his ineffective-assistance claim before the district court by moving for a new trial. The district court conducted a lengthy hearing on the issue, during which Foreman's trial counsel was examined by his new counsel. A ruling on the issue was rendered by the district court. On appeal, both parties have briefed the question of ineffective assistance. The record is therefore sufficiently developed for us to address the merits of Foreman's claim.

Foreman alleges that his trial counsel performed ineffectively by failing to call either an alibi witness, Howard Clark, or several other witnesses who were prepared to offer testimony that would have tangentially corroborated Foreman's alibi defense. In addition, Foreman asserts that his trial counsel was laboring under a conflict of interest because the attorney did not believe Foreman's claim that Foreman was the victim of a fraud rather than the perpetrator.

The test for establishing a constitutional claim based upon the ineffective assistance of counsel is two-fold. A defendant must first show that the performance of his or her counsel was "below an objective standard of reasonableness." *Strickland*,

466 U.S. at 688. In order to avoid second-guessing trial counsel's strategic decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted). The second requirement of an ineffective-assistance claim is that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Foreman's defense throughout his prosecution was that he had developed a business relationship in the mid-1990s with someone named Jim Hunt and had given him $65,000 to invest in property in Dayton, Ohio. According to Foreman, he refinanced this property with Hunt's assistance and thereby obtained $664,000, which he then handed over to Jim Hunt to put into an escrow account. Foreman maintained that on April 27, 2000, at about 5:00 p.m., it was Hunt who delivered to him the counterfeit $500,000 check, which Foreman assumed had been taken from the recently created escrow account. Further, Foreman denied withdrawing money from Miami Valley Bank's ATM on that date. He claimed that he was at home showing wedding photographs to his friend, Howard Clark, at the time the $230 was removed from the Bank's ATM. Foreman testified about all of these matters at trial.

Howard Clark was prepared to say that he was with Foreman at the latter's home on April 27, 2000, looking at Foreman's wedding photographs, during the time that the transactions at Miami Valley Bank took place. Foreman's trial counsel interviewed Clark and issued a subpoena for him to testify, but chose not to call him to the witness stand. Foreman now contends that "[t]here were no alternatives to Mr. Clark's testimony. The failure to present the testimony

of Mr. Clark offered no alternative to corroborate Mr. Foreman's testimony regarding his alibi."

As part of the government's case, however, a Miami Valley Bank employee identified Foreman as the man who purchased the $50 cashier's check on April 27, 2000, at about 12:25 p.m., and she identified him as the man shown in photographs from a security camera withdrawing money from the ATM moments before. Foreman does not contest that the money was withdrawn from his Honda Federal Credit Union account using his ATM card and personal identification number. Moreover, in his interview with Foreman's trial counsel, Clark provided no explanation as to why he had left his job in the middle of the day on April 27, 2000 to go sit with Foreman at the latter's home for a couple of hours to look at wedding photographs. Under these circumstances, Foreman's trial counsel had a reasonable basis to believe that Clark was fabricating his proposed testimony, a fact that could be exposed on cross-examination. Not calling Clark to testify was therefore a reasonable trial strategy, especially given that Foreman had already offered this alibi on the witness stand.

Foreman also argues that he "was never afforded the opportunity to effectively impeach the Government's evidence when counsel failed to call available witnesses, or present evidence to corroborate his testimony regarding other key aspects to prove that he too was a victim." Three categories of evidence, none of which was used by Foreman's counsel at trial, are relevant to this argument. First, Jason Foreman, Robert Jacobs, and Robert Raines were willing to testify in vague and general terms that they had seen, met, or heard of Jim Hunt. Although such testimony could have bolstered the claim that Jim Hunt actually existed, it might also have drawn attention to the facts that Hunt was nowhere to be found and that Foreman could produce no records of any dealings with Hunt. Vague affirmations of the existence of this mysterious person, who allegedly defrauded Foreman of hundreds of thousands of dollars (though Foreman had no documentary proof that he had lost any money) and then vanished without a trace, might have given the jury more

reason to doubt his existence than did the relatively specific testimony of Foreman. The decision not to call these three witnesses was therefore a reasonable trial strategy.

Second, Foreman takes issue with his trial counsel's failure to call as witnesses the police officers with whom Foreman spoke on May 6, 2000. These officers could have verified that Foreman had appeared at the police station to claim that he had been defrauded. As the district court noted, however, Foreman himself testified that he went to the police on that date, and the government did not seek to prove otherwise. What the testimony of the officers would have added is thus not clear. Moreover, their testimony might have drawn the jury's attention to the fact that Foreman provided the police with no documentation to back up his claim. This would have given the jury a reason to suspect that Foreman had not, in fact, been the victim of a fraud. The decision not to call the Fairfield police officers to testify was therefore a reasonable trial strategy.

Finally, Foreman contends that his trial counsel should have offered into evidence photographs of the building in Dayton that Foreman allegedly owned with Jim Hunt. But the photographs were of nothing more than an unidentified building in Dayton. Foreman had no evidence that he ever owned the building, nor did he have any documentation (such as tax records) to show that he had any connection to it at all. As with all of the forgoing evidence, the photographs could have corroborated to some degree an aspect of Foreman's testimony, but they could also have highlighted for the jury the suspicious circumstance that Foreman had no records of any connection to the building that he supposedly owned. His trial counsel's decision not to use these photographs was therefore a reasonable trial strategy.

Because the performance of Foreman's trial counsel did not fall below an objective standard of reasonableness, Foreman cannot satisfy the first component of his ineffective-assistance claim. *See United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (concluding that counsel's performance was not

deficient, even though an alibi defense was not pursued as thoroughly as possible and not every defense witness was presented, where "many [potential witnesses] were cumulative or unreliable" and two "would probably have been impeached if they testified"). Moreover, even if he could demonstrate deficient performance, Foreman cannot show that he was prejudiced. Foreman himself testified to all of the facts that the additional evidence might have supported. At best, the additional evidence would have tangentially corroborated certain aspects of Foreman's testimony. But it would not have directly undermined the in-court identification of Foreman, nor would it have called into question the undisputed fact that the $50 cashier's check was purchased with money withdrawn from Foreman's credit union account using his ATM card and personal identification number. Indeed, as explained above, introduction of the additional evidence might simply have made Foreman's defense more suspect.

Counsel's failure to present this additional evidence, therefore, does not undermine our confidence in the outcome of the proceeding. *See Moss v. Hofbauer*, 286 F.3d 851, 867 (6th Cir.) (finding that a defendant was not prejudiced by his counsel's failure to interview or call as a witness someone who might have confessed that he, rather than the defendant, committed the crime, where "the prosecutor could have thoroughly impeached" the proposed witness and a magistrate judge determined that the proposed testimony "lacked credibility"), *cert. denied*, 123 S. Ct. 702 (2002); *United States v. Morrow*, 977 F.2d 222, 230, 229 (6th Cir. 1992) (concluding that "[i]n the face of substantial evidence supporting Morrow's conviction, his claim that but for counsel's ineffective representation the outcome of the proceedings would have been different is hollow," where "Morrow's discontent is focused mostly on tactical decisions regarding whether to object or which witnesses to call").

Foreman nevertheless argues that he is entitled to a presumption of prejudice because his trial counsel was laboring under an alleged conflict of interest. "[A] defendant

who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980). In Foreman's view of the case, "the conflict is between trial counsel's lack of belief in his client and his professional obligation to provide a competent defense on his client's behalf." But he cites no authority, nor have we found any, for the novel proposition that "lack of belief in [one's] client" can constitute a conflict of interest.

An attorney has no adverse interest simply because he or she entertains doubts about the veracity of the client. Unlike the situation in which an attorney simultaneously represents multiple defendants who have antagonistic defenses, an attorney representing a single client whose alibi he or she doubts is not working under a conflict of interest by virtue of that disbelief. An attorney has the obligation to zealously represent the client's interests despite the attorney's personal beliefs. *Cf. Tate v. United States*, 359 F.2d 245, 253 (D.C. Cir. 1966) ("The fact that the chances of prevailing are slim is not a reason for withdrawal, but is rather a summons to conscientious counsel to devote his professional skill and pertinacity to the most effective presentation of which he is capable."). We therefore reject Foreman's claim of prejudice based upon his trial counsel's alleged conflict of interest.

**B.    The district court did not err in increasing Foreman's base offense level on the ground that he knew that the funds were the proceeds of a specified unlawful activity**

Foreman argues that the district court erred in increasing his base offense level because he knew that the funds were the proceeds of a specified unlawful activity. Where, as here, the application of a particular Guideline is not fact-bound, "[l]egal conclusions regarding application of the United States Sentencing Guidelines are reviewed de novo . . . ." *United States v. Hover*, 293 F.3d 930, 933 (6th Cir. 2002) (emphasis omitted).

The district court placed Foreman's base offense level at 17 pursuant to United States Sentencing Guidelines Manual § 2S1.2 (2000), the Guideline for violations of 18 U.S.C. § 1957. In accordance with § 2S1.2(b)(1), the court increased the base offense level by two points because "the defendant knew that the funds were the proceeds of . . . specified unlawful activity (*see* 18 U.S.C. § 1956(c)(7))." Foreman asserts that "[t]he laundry list of offenses does not include any of the charges for which Mr. Foreman has been convicted." A "specified unlawful activity," however, is defined in 18 U.S.C. § 1956(c)(7) to include "an offense under . . . section 513 (relating to securities of States and private entities)." Section 1956(c)(7) also incorporates "any act or activity constituting an offense listed in section 1961(1)," and § 1961(1) includes acts indictable under "section 1344 (relating to financial institution fraud)."

The jury convicted Foreman on Count One, which charged him with a violation of 18 U.S.C. § 513, and on Counts Two and Three, which charged him with violations of 18 U.S.C. § 1344. His assertion that the district court misread the applicable Sentencing Guideline is therefore incorrect. The enhancement, moreover, fits the facts of Foreman's case. When Foreman exchanged the $160,081.15 check at National City Bank for cash and five other checks, he knew that the $160,081.15 check had been derived from the counterfeit $500,000 cashier's check.

Alternatively, Foreman contends that application of the enhancement constitutes impermissible double counting. He argues that the money-laundering statute itself requires the derivation of funds from specified unlawful activities, so that the facts giving rise to the enhancement are already included in the base offense level. The enhancement, however, requires that the defendant *know* that the funds were the proceeds of a specified unlawful activity. In contrast, the underlying statute requires only that the property transacted is *in fact* derived from a specified unlawful activity. As 18 U.S.C. § 1957(c) itself makes explicit, "[i]n a prosecution for an offense under this section, the Government is not

required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity."

We therefore join the Eighth Circuit in holding that "because this specific offense characteristic enhancement applies to conduct that is not an element of the offense, it does not amount to impermissible double counting." *United States v. Hare*, 49 F.3d 447, 452 (8th Cir. 1995) (applying the enhancement pursuant to § 2S1.2(b)(1)(B) of the United States Sentencing Guidelines Manual to a money-laundering offense under 18 U.S.C. § 1957); *see United States v. Young*, 266 F.3d 468, 485 (6th Cir. 2001) ("[T]he specific offense characteristic under U.S.S.G. § 2S1.2(b)(1)(B) enhances the sentence of a defendant who possesses such knowledge at the time he launders the funds at issue in the money laundering offense.").

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.