*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT GIRTS,

          *Petitioner-Appellant,*

   *v.*

CHRIS YANAI, Warden,

          *Respondent-Appellee.*

No. 05-4023

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00264—Kathleen McDonald O'Malley, District Judge.

Argued: June 6, 2007

Decided and Filed: September 5, 2007

Before: MARTIN, BATCHELDER, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Hope E. Redmond, THOMPSON HINE, Cleveland, Ohio, for Appellant. Thelma T. Price, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Hope E. Redmond, Robert F. Ware, THOMPSON HINE, Cleveland, Ohio, for Appellant. Bruce D. Horrigan, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

     CLAY, J., delivered the opinion of the court, in which MARTIN, J., joined. BATCHELDER, J. (p. 16), delivered a separate dissenting opinion.

---

## OPINION

---

     CLAY, Circuit Judge. Petitioner Robert Girts appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner argues that his conviction for aggravated murder violated his Fifth and Sixth Amendment rights because the prosecution improperly commented on his right to remain silent during closing argument, and his trial counsel was ineffective in failing to object to the prosecutor's statements. For the reasons that follow, we **REVERSE** the district court's decision, conditionally **GRANT** the writ of habeas corpus petition, and **REMAND** this case to the district court.

1

## BACKGROUND

### I.   Procedural History

On February 9, 1993, Petitioner was indicted for aggravated murder, under Ohio Revised Code ("O.R.C.") § 2903.01, by a grand jury in Cuyahoga County, Ohio.  At the ensuing trial, Petitioner testified in his defense.  Petitioner was convicted of aggravated murder by a jury in the Cuyahoga County Court of Common Pleas ("trial court") on June 3, 1993.  The Ohio Court of Appeals, Eighth District ("Eighth District") reversed the conviction. *State v. Girts*, No. 65750, 1994 WL 393678, at *12 (Ohio Ct. App. 8th Dist. July 28, 1994) (holding that "[t]he state's questioning [on cross-examination] . . . was not founded in good faith and materially prejudiced the defense").  The case was re-tried before a different judge.  Petitioner did not testify during the second trial.

During the second trial, the prosecution made three statements concerning Petitioner's failure to testify in his closing argument.  The prosecutor stated:

> Again these are his words. And the words that you heard from these folks supplied by him are unrefuted, and they are uncontroverted. There has been no evidence offered to say that these people are incorrect. None at all.

(J.A. 1284).  The prosecution asserted that "with respect to the source [of the cyanide], the defendant had no less than three occasions to tell the police that he had ordered the cyanide."  (J.A. 1285)  Last, the prosecutor stated:

> Ladies and gentlemen, we don't have to tell you how it was introduced into her system. We know that it was ingested. And there is only one person that can tell you how it was introduced, and that's the defendant.

(J.A. 1287)  Petitioner's counsel did not object to the prosecutor's statements.  Petitioner was again convicted of aggravated murder by a jury on August 9, 1995.

Petitioner filed two notices of appeal with the Eighth District challenging his conviction. The two appeals were consolidated, and the Eighth District affirmed the trial court's judgment on June 12, 1997.  Petitioner filed a motion for reconsideration with the Eighth District, which was denied on July 24, 1997. *State v. Girts*, 700 N.E.2d 395 (Ohio Ct. App. 8th Dist. July 24, 1997). On July 25, 1997, Petitioner filed a *pro se* motion for leave to appeal which the Ohio Supreme Court denied on October 15, 1997. *State v. Girts*, 685 N.E.2d 237 (Ohio 1997).  Petitioner's motion for reconsideration was denied on December 10, 1997. *State v. Girts*, 687 N.E.2d 299 (Ohio 1997).

On January 22, 1996, Petitioner filed an application for post-conviction relief with the trial court alleging ineffective assistance of counsel, which was denied on November 27, 1997.  The Eighth District affirmed the trial court's decision on December 4, 2000.  Petitioner appealed to the Ohio Supreme Court, but the motion for leave to appeal was denied.

Petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio on February 12, 2002.  Petitioner maintained that his "due process rights and [ ] right to a fundamentally fair trial were violated when the prosecutor improperly commented on Petitioner's right to remain silent," and that he was denied effective assistance of counsel. (J.A. 10)  A magistrate judge issued a report and recommendation on May 29, 2003, recommending that the writ of habeas corpus petition be denied.  Petitioner filed objections to the report and recommendation.  On July 12, 2005, the district court found that the prosecutor improperly commented on Petitioner's right to remain silent and that trial counsel was ineffective

in failing to object to the prosecution's statements, but held that Petitioner failed to show prejudice and denied the petition for writ of habeas corpus. *See Girts v. Yanai*, No. 02CV0264, 2005 WL 1637862, at *1 (N.D. Ohio July 12, 2005). Petitioner filed a timely notice of appeal on August 3, 2005.

## II.        Substantive Facts

This Court relies on the facts as they were found by the state appellate court on direct review. *See, e.g.*, *Bell v. Bell*, 460 F.3d 739, 743 (6th Cir. 2006); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). In this case, the facts as stated by the Ohio Court of Appeals are as follows:

> . . . [D]efendant and decedent lived in a house that adjoined the funeral home where defendant worked as a funeral director and embalmer. On the morning of September 2, 1992, defendant and several others began driving back from Chicago to Parma after having assisted in moving defendant's brother. Decedent remained at home, being scheduled to work at noon that day. When she did not arrive at work on time, a co-worker telephoned the funeral home and expressed her concern over decedent's unusual tardiness. A funeral home employee noticed decedent's car in the driveway, so he checked the house. The employee found the screen door open and called into the house. When decedent failed to respond, he entered the house and discovered her body slumped over in the bathtub.
>
> The police found no evidence of foul play nor any obvious sign of suicide. A razor floating on the bath water, a hot curling iron resting on a nearby dressing table, and the couples' dog roaming in the yard led the police to conclude that decedent had died suddenly while bathing. Because the police could not readily determine a cause of death, they transported the body to the coroner's office for an autopsy.
>
> During the autopsy, the coroner's office noted no obvious cause of death. The coroner did find an undigested meal of pasta salad in decedent's stomach, and recognized lividity or reddening of the skin which would typically be found in a person exposed to carbon monoxide. Carbon monoxide testing, however, showed no significant levels. The coroner listed no cause of death.
>
> Around September 20, 1992, defendant telephoned the police and told them that he had found a note, hand-written by decedent, which might explain her death. The undated note stated, "I hate Cleveland. I hate my job. I hate myself." Defendant explained that he found the note underneath some papers in his brief case. He told police that decedent had been despondent over their recent move to the Cleveland area. She had difficulty finding work and worried that she had a weight problem. Defendant also told the police that decedent suffered three miscarriages and had been trying to come to grips with the thought that she might not be able to bear children.

At about the same time, the coroner ordered department toxicologists to perform additional tests on body fluids taken from decedent, specifically asking them to detect the presence of any poisons. An initial test for the presence of potassium cyanide had to be discarded when the toxicologist discovered that reagents used in the testing process had been compromised. New reagents were obtained and the toxicologist obtained a positive result for cyanide at about twice the minimum lethal dose. The coroner verified this result by asking the Franklin County Coroner's Office to test for the presence of cyanide by using a different methodology. The Franklin County Coroner obtained virtually identical results. The coroner then listed the cause of death as homicide.

The police returned to defendant's house and executed a search warrant, pointedly telling defendant that they were looking for cyanide or other poisons. Defendant cooperated with the search, but the police found nothing. The police questioned the funeral home operators about the possible use of cyanide in the embalming process, but found no evidence that the funeral home had received cyanide from any of its suppliers. A funeral home director later recalled a conversation with defendant in which they discussed how the police investigated funeral home supply shipments for deliveries containing cyanide and defendant said, "That is not where I got it from."

The evidence did not show that the police had any suspects until they broadcast a plea for assistance with a television crime watch service. As a result of that broadcast, defendant's commanding officer in the Army reserves came forward in January 1993 with information that she had sent defendant two grams of potassium cyanide. She explained that defendant knew that she worked as a chemist in her civilian job and that in the spring of 1992, he asked her if she could supply him with a small amount of cyanide for use in controlling groundhogs on his property. The commanding officer did not immediately send the cyanide. She later discovered that defendant had left his business card on her desk. A notation on the card, in defendant's handwriting stated, "Thank you for your help." In the lower corner of the card defendant wrote "KCN," the chemical abbreviation for potassium cyanide. The card reminded the commanding officer of defendant's request, so she sent "a couple of grams" of cyanide to the funeral home address listed on defendant's business card. The commanding officer explained that she came forward with the information after learning that defendant's wife had died as a result of cyanide poisoning.

When confronted with evidence that he had obtained cyanide, defendant told the police that he had used the cyanide to control groundhogs on the property. A funeral home employee, however, insisted that he had no knowledge of a groundhog problem, and produced records showing that squirrels were the only pest control problem on the property. The city pest control officer stated that he had no complaints about groundhogs. A representative from a pest control company conceded that cyanide might have been used for pest control well in the past, but that in ten years of business, she had not used any products containing cyanide.

Other persons came forward with information that soon corroborated police suspicion on defendant. A business associate recalled a conversation in which defendant abruptly interrupted her to ask if she could show him the measurement of a gram. When the business associate asked why he needed this information, defendant said that he needed to measure some medicine for his dog's food. Defendant's veterinarian, however, stated that he prescribed no medication for the dog that would require any kind of measuring.

A colleague at the funeral home described a conversation in which he said that defendant had told him that decedent committed suicide. When the colleague wondered how decedent could procure cyanide, defendant responded that "she probably got it down on West 25th Street where she worked because she came in contact with a lot of low lifes." In a subsequent conversation, the colleague again wondered how decedent could have obtained the cyanide, and this time defendant said, "Someone at the coroner's office probably spilled some of it because they keep it there."

Another funeral home colleague testified that when the ambulance came to transport decedent's body, defendant yelled to the drivers that they should take the body to Parma General Hospital. The police learned that defendant had previously worked for the Lorain County Coroner. His experience there would tell him that all deaths occurring without any known natural cause would ordinarily be investigated by the coroner's office, which ordinarily performed more complete autopsies than hospitals.

The police also began to question decedent's motivation to commit suicide. Several close friends told the police that they had spoken with decedent shortly before her death and found her in good spirits. The friends found nothing unusual about her behavior and noted that decedent was looking forward to moving into a house she and defendant recently purchased. One friend did, however, say that she had met with defendant shortly before decedent's death and he told her that decedent was depressed about living in Cleveland. This statement contradicted the friend's perceptions. Just three days before her conversation with defendant, the friend spent the weekend with decedent and defendant and found nothing unusual about decedent's demeanor.

The state settled on two factors motivating the murder. First, it discovered that defendant had had a fitful affair with another woman who would not continue the affair as long as defendant remained married. Defendant and the woman first became involved for a short period in 1980, but the woman broke off the affair because she had discovered defendant lying about his marital status with a previous wife. The affair resumed briefly in either 1985 or 1986, but ended shortly by mutual agreement. It resumed again in February 1992. Defendant told the woman that he was married, but that he and his wife were divorcing and expected to finalize the divorce in July 1992. The intimate portion of their relationship ended in late May 1992,

although they remained in contact for several more months. Defendant stipulated that he was not a party to any divorce action.

Defendant called this woman shortly after decedent's death and informed her that decedent had died from an aneurysm. They spoke twice thereafter and, in the early part of October 1992, the woman received an early morning telephone call from defendant in which he said, "Miss Bethea, this is Robert Girts. We'll have to put the decorating of my house on hold. Something really bizarre has happened." When the woman asked what happened, defendant replied, "I'm being investigated for my wife's death." He then hung up. The woman found this conversation unusual because defendant had never referred to her as "Miss" and because, while she had worked as an interior designer, she had not discussed decorating the interior of defendant's house.

The woman then called the police and informed them of her conversation with defendant. Defendant telephoned her late that evening. When he heard that she had telephoned the police and that they would be coming to question her, he said there was no harm in her doing design work for him and she should "be brief" during questioning.

The second motivating factor arose from defendant's financial status. Defendant stipulated that he had received just over $50,000 as proceeds from life insurance policies taken on decedent's life. The state tied this money to defendant's purchase of a house and his desire to invest $10,000 and become a silent partner in another funeral home.

Defendant's case consisted primarily of evidence showing that he had been in Chicago at the time of decedent's death (a fact the state did not dispute) and expert testimony rebutting the state's findings relating to the manner and cause of death.

Defendant's sister-in-law testified that she ate from a bowl of pasta salad she had found in defendant's refrigerator and suffered no ill effects.

Defendant's expert testified that he would have listed the cause of death as "undetermined" because in his opinion the level of cyanide found in decedent's body did not correspond with the classic signs of cyanide poisoning that he would have expected to find. The expert testified that cyanide basically poisons all the cells in the body to the point where they cannot use oxygen. Because the cells cannot use oxygen, the blood becomes superoxygenated, thus giving the body its reddish appearance. The cyanide victim can breathe, but nonetheless experiences the sensation and effects of asphyxiation. The onset of cyanide poisoning is marked by dizziness or faintness with rapid breathing. Convulsions, palpitations, or seizures may follow before the victim falls into a coma and dies.

The outward indicia of cyanide ingestion include burning around the mouth and throat area, uniform lividity of other major internal organs, petechiae or small bleeding points usually found in the stomach, involuntary release of both urine and fecal matter, and collection of

fluid in the lungs. Of these signs, only the lividity and collection of fluid in the lungs were present. The expert thought that the lividity and collection of fluid, however, could be explained by other factors, such as the immediate refrigeration of the body after being taken from warm water.

*Girts*, 700 N.E.2d at 400-02.

## DISCUSSION

### I.          Standard of Review

"In a habeas corpus proceeding, this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error." *Miskel v. Karnes*, 397 F.3d 446, 451 (6th Cir. 2005) (citation omitted).

### II.          Legal Framework

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a writ of habeas corpus petition may be granted if a state court decision:

> was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [ ] resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has found that

> A state-court decision involves an unreasonable application of [Supreme] Court[ ] precedent if the state court identifies the correct governing legal rule from th[e] [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of th[e] [Supreme] Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams v. Taylor*, 529 U.S. 362, 407 (2000) (citation omitted); *see also Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).

"A federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment 'rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the [state] court's decision.'" *Frazier v. Huffman,* 343 F.3d 780, 790 (6th Cir. 2003) (quoting *Harris v. Reed*, 489 U.S. 255, 260 (1989)); *see also Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). "In general, a federal court may not consider a claim for habeas corpus relief if the claim was procedurally defaulted in state court– *i.e.,* if the last state court to render a judgment in the case rejected the claim because it was not presented in accordance with the state's procedural rules." *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004) (citing *Harris*, 489 U.S. at 262).

"A procedurally defaulted claim may be considered in federal habeas corpus proceedings only if the petitioner either shows 'cause' for his failure to comply with the state's procedural rules and

'prejudice' resulting from the alleged violation of federal law or shows that the federal court's refusal to consider the claim will result in a 'fundamental miscarriage of justice.'" *Id.* (quoting *Coleman*, 501 U.S. at 750). "The district court's application of the 'cause and prejudice' rules must be reviewed de novo." *Id.* (citing *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

To determine whether a claim has been procedurally defaulted, this Court applies a four-part test:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . *Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim . . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.*

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (footnotes and citations omitted) (formatting and emphasis added); *see also Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) (same). In the instant case, since Petitioner concedes that "the first two prongs of the foregoing test are satisfied," only the last two prongs of the test will be discussed below. (Pet. Br. at 21)

## III.     Procedural Default

### A.      Adequate and Independent State Ground

This Court has found that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (citation omitted). To constitute an "adequate and independent state procedural rule," a rule must be "firmly established and regularly followed," and cannot rely on federal law. *Smith v. Ohio Dep't of Rehab. & Corrs.*, 463 F.3d 426, 431 (6th Cir. 2006). "[I]f it fairly appears that the state court rested its decision primarily on federal law, this Court may reach the federal question on review unless the state court's opinion contains a plain statement that [its] decision rests upon adequate and independent state grounds." *Harris*, 489 U.S. at 261 (internal quotation marks and citations omitted); *see also Clinkscale v. Carter*, 375 F.3d 430, 450 (6th Cir. 2004); *Bowling v. Parker*, 344 F.3d 487, 498 (6th Cir. 2003).

In *Clinkscale*, a case where the state court decision did not clearly and expressly indicate reliance on a state procedural rule, this Court found that

> [a]lthough the decision unquestionably mention[ed] [the state procedural rule] and its requirements, it also emphasize[d] and relie[d] upon the fact that [petitioner's] ineffective assistance claim had already been raised on direct appeal.

375 F.3d at 442. This Court held that "[i]t [was] unclear on what ground, or grounds, the [state] court's judgment rested," and that "[u]nder th[ose] circumstances, [this Court] [is] unable to say that the [state court] decision 'clearly and expressly states that its judgment rests on a state procedural

bar.'" *Id.* (quoting *Harris*, 489 U.S. at 263). The Court concluded that the claim was not procedurally defaulted and addressed the merits of the claim.

Similarly, in *Bowling*, this Court found that "[t]he language used by the [state court] in its opinion reveal[ed] that it did not clearly rely on [petitioner's] procedural default to dismiss the claims raised in his supplemental motion." 344 F.3d at 498. "After noting that the claims were raised only in the struck supplemental pleadings, the [state court in *Bowling*] . . . consider[ed] the merits of those claims, stating, 'Notwithstanding that his supplemental motion was struck by the trial court, in the interest of judicial economy we will review the seven additional claims of ineffective assistance of counsel raised in the motion.'" *Id.* (citation omitted). This Court found that the state court opinion was ambiguous and vague with respect to the procedural bar, and proceeded to consider the petitioner's claims on the merits. The Court found that "there must be unambiguous state-court reliance on a procedural default for it to block our review." *Id.* (citing *Gall v. Parker*, 231 F.3d 265, 321 (6th Cir. 2000); *see also Harris*, 489 U.S. at 266 n.13 (noting the fact that "the state court clearly went on to reject the federal claim on the merits" makes it less clear that the state court actually relied on the procedural bar). If "the adequacy and independence of any possible state law ground is not clear from the face of the [State court's] opinion," this Court "[may] presume that there is no independent and adequate state ground for [the] state court decision." *Coleman*, 501 U.S. at 735 (internal quotation marks and citations omitted).

In the instant case, Eighth District's opinion appears to be ambiguous. While the judgment appears to rest on a state procedural bar, *see Girts*, 700 N.E.2d at 413-14, the court expressly found that a federal constitutional right was involved and cited *Griffin v. California*, 380 U.S. 609 (1965), for the proposition that "the state may not comment on an accused's failure to testify at trial," *Girts*, 700 N.E.2d at 413 (citations omitted). As in *Clinkscale* and *Bowling*, it is not clear whether the opinion expressly states that the judgment is based on an adequate and independent state law ground. However, we do not have to make a determination with respect to the adequacy and independence of a possible state law ground because Petitioner conceded at oral argument that the state court conducted only a plain error review of the underlying claims. This concession is significant. This Court has found that "plain error review [by a state appellate court] does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542, 557 (2000) (citation omitted). Petitioner attempts to distinguish this case from *Seymour* arguing that, unlike *Seymour*, this case involves a federal constitutional claim. Even assuming *arguendo* that the claims in *Seymour* were exclusively based on Ohio substantive law, the proposed distinction between federal and state claims is unsupported by case law. Petitioner cannot point to case law that supports distinguishing between claims based on state substantive law or federal constitutional law. Simply put, there is no exception to *Seymour* for cases concerning federal constitutional claims. Since Petitioner conceded that the state court performed a plain error review, in light of *Seymour*, we cannot find a waiver of the state procedural default rules. Therefore, we find Petitioner's underlying due process claim to be procedurally defaulted.

### B.        Cause and Prejudice

This Court has found that a procedural default may be overcome by "demonstrat[ing] cause for the [procedural] default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Smith v. Ohio Dep't of Rehab. & Corrs.*, 463 F.3d at 431 (internal quotation marks and citation omitted); *see also Ege v. Yukins*, 485 F.3d 364, 378 (6th Cir. 2007). For the reasons set forth below, we find that Petitioner meets the cause and prejudice exception to the procedural default because his trial counsel was ineffective in failing to object to the prosecution's statements during closing argument.

### 1.      The Prosecutor's Statements

In this case, the prosecutor made three statements during closing argument about Petitioner's failure to testify.  In pertinent part, the prosecutor stated:

> Again these are his words. And the words that you heard from these folks supplied by him are unrefuted, and they are uncontroverted. *There has been no evidence offered to say that these people are incorrect. None at all.*

(J.A. 1284) (emphasis added).  This comment points directly to Petitioner's failure to testify and suggests to the jury that Petitioner had an affirmative obligation to refute witness testimony.  The statement suggests that the exercise of the Fifth Amendment right to remain silent negatively impacted the evidence presented at trial – namely, witness testimony went "unrefuted" and "uncontroverted."

The prosecutor also stated that "with respect to the source [of the cyanide], the *defendant had no less than three occasions to tell the police* that he had ordered the cyanide."  (J.A. 1285) (emphasis added).  Again, this statement focused on Petitioner's Fifth Amendment right to remain silent.

Last, the prosecutor stated:

> Ladies and gentlemen, we don't have to tell you how it was introduced into her system. We know that it was ingested. *And there is only one person that can tell you how it was introduced, and that's the defendant.*

(J.A. 1287) (emphasis added).  As the district court noted, this "statement is anything but a comment on the evidence." (J.A. 1230)  By indicating that Petitioner was the "only one person" who could explain the crime to the jury, the prosecutor highlighted the fact that Petitioner did not testify, and attached a negative connotation to the exercise of the Fifth Amendment right to remain silent.

The prosecutor's three statements were improper, misleading and highly prejudicial because they implied that Petitioner was obligated to testify and to speak to the police.  In the words of the district court, the prosecution cannot "take the deficiencies in its own case, which the defense has every right – indeed, every obligation – to point out, and utilize those deficiencies against [Petitioner]." *Id.*  Nevertheless, trial counsel failed to object to the prosecutor's improper statements during closing argument.  The failure to object to the improper and prejudicial statements constitutes ineffective assistance of counsel.

### 2.      Ineffective Assistance of Counsel

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 667, 688 (1984); *see also Keith v. Mitchell*, 455 F.3d 662, 682 (6th Cir. 2006); *United States v. Foreman*, 323 F.3d 498, 503 (6th Cir. 2003).  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Keith*, 455 F.3d at 682; *Foreman*, 323 F.3d at 503.

"In order to avoid second-guessing trial counsel's strategic decisions," review of counsel's performance is highly deferential.  *Foreman*, 323 F.3d at 503.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;

that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted). "A reviewing court must judge the reasonableness of counsel's actions on the facts of the defendant's case, viewed from counsel's perspective at the time," *Higgins v. Renico*, 470 F.3d 624, 631-32 (6th Cir. 2006), and "strategic choices must be respected if they were made after thorough investigation of law and facts relevant to plausible options," *id.* at 632 (internal quotation marks and citations omitted). "[A] defendant has the burden of proving, by a preponderance of the evidence, that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,'" *id.* (quoting *Strickland*, 466 U.S. at 687). "Unless the accused receives the effective assistance of counsel, a serious risk of injustice infects the trial itself." *United States v. Cronic*, 466 U.S. 648, 656 (1984) (internal quotation marks and citation omitted).

Under *Strickland*, Petitioner must establish prejudice to bring a successful ineffective assistance of counsel claim. 466 U.S. at 688. "[Petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner must demonstrate that "counsel's errors were serious enough to deprive [him] of a proceeding the result of which was reliable." *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995). "[T]he prejudice prong is satisfied if there is a reasonable probability that at least one juror would have struck a different balance." *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003) (internal quotation marks and citation omitted). Prejudice may be presumed "if petitioner's counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing[.]'" *Millender v. Adams*, 376 F.3d 520, 524 (6th Cir. 2004) (quoting *Cronic*, 466 U.S. at 659).

In this case, trial counsel's failure to object allowed the prosecutor's improper and prejudicial statements to reach the jury uncontested and without the proper admonition from the trial court. This inaction simply cannot be characterized as litigation strategy. There was no conceivable benefit to be derived from failing to challenge the prosecutor's improper statements. "[T]he prejudice resulting from [counsel's] lawyering is [ ] patent." *Groseclose v. Bell*, 130 F.3d 1161, 1170 (6th Cir. 1997). "[Counsel's] performance was so inept as to amount to a constructive denial of counsel, relieving [Petitioner] of the need to show prejudice." *Id.* If trial counsel had raised an objection, the trial court would have reprimanded the prosecutor and issued a prompt curative instruction to the jury. In turn, the jury would have heard from the judge that the prosecutor's comments called for an improper and impermissible negative inference for Petitioner's exercise of his Fifth Amendment rights. Certainly, if an objection had been raised to the prosecutor's first statement, the prosecutor would not have been permitted to continue to overstep with subsequent comments. Trial counsel's failure to object exacerbated the prejudicial effect of the prosecutor's statements. We find that there is a strong likelihood that at least one juror would have changed his mind if the improper and prejudicial statements would not have been made, especially because the prosecutor presented weak and limited evidence at trial. Trial counsel clearly rendered ineffective assistance of counsel by failing to object to the prosecutor's statements.[1]

---

[1] In this case, the state court found that the prosecutor's statements were not improper or prejudicial and that "nothing in the record suggests that, but for the[ ] [improper prosecutorial] comments, the verdict would clearly have been different." (J.A. 1240) Although the district court found that the statements were prejudicial, the court deferred to the state court's conclusion and denied the writ of habeas corpus petition. (J.A. 1240) Case law clearly indicates that this Court does not give deference to a state court's conclusion that *Strickland* was not violated if the state court improperly concludes that the prosecutor's statements were not prejudicial. When a state court fails to "recognize[ ] the clear predicate problem itself, the trial court's conclusion that [trial counsel] did not violate *Strickland* by failing to object to that problem is . . . inherently flawed." *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000). Since the state court found that the prosecutor's statements were not improper or prejudicial, it failed to recognize the "predicate problem itself." *Id.* Indeed, "[t]o characterize [the state court's] conclusion as an 'objective reasonable' application of *Strickland* would be to dilute our review under the AEDPA to a generous apology for the clearest of errors." *Id.* The

This Court has recognized that ineffective assistance of counsel may be used to satisfy the "cause" prong of the procedural default exception. *See, e.g.*, *Hofbauer*, 228 F.3d at 708-09; *see also Ege*, 485 F.3d at 378. Attorney error may constitute cause if it rises to the level of constitutionally ineffective assistance of counsel. *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996); *see also Bell*, 460 F.3d at 761 (noting that "attorney error can only be considered cause if the error meets the threshold of ineffective assistance of counsel in violation of the Sixth Amendment"). Because trial counsel's failure to object rises to the level of ineffective assistance of counsel, Petitioner has established "cause" to overcome the state procedural bar. Petitioner has also established "prejudice" to overcome the state procedural bar. As discussed above, trial counsel's failure to object prejudiced Petitioner and aggravated the prejudicial effect of the prosecutor's improper and highly prejudicial statements. *Ege*, 485 F.3d at 379. Since Petitioner presents a successful ineffective assistance of counsel claim, and has established cause and prejudice to overcome the state procedural bar, we will address the merits of the Petitioner's claims below.

## IV. The Prosecutor's Statements Violated Petitioner's Fifth Amendment Rights and Were Sufficiently Flagrant to Warrant Reversal of Petitioner's Conviction Despite Trial Counsel's Failure to Object

The prosecutor's improper statements constitute prosecutorial misconduct because Petitioner's silence cannot be used against him as substantive evidence. In *Combs v. Coyle*, a police officer questioned defendant at the scene of a crime, and defendant told the police officer to "talk to my lawyer," the prosecution commented on defendant's silence during closing argument:

> Talk to my lawyer. Talk to my lawyer. Does that sound like someone who's so intoxicated he doesn't know what is going on? Isn't that evidence that he realizes the gravity of the situation and at this time gave that particular comment or response to [the police officer]?

205 F.3d 269, 279 (6th Cir. 2000) (citation omitted). This Court recognized that

> [t]he Supreme Court has given the privilege against self-incrimination a broad scope, explaining that "[i]t can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."

*Id.* (quoting *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972)). This Court expressly found that the Fifth Amendment "is not limited to persons in custody or charged with a crime" and that the privilege "may also be asserted by a suspect who is questioned during the investigation of a crime." *Id.* at 283 (quoting *Coppola v. Powell*, 878 F.2d 1562, 1565 (1st Cir. 1989)); *see also Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986) (finding that "silence does not mean only muteness; it includes the statement of a desire to remain silent as well as of a desire to remain silent until an attorney has been consulted"). The Court indicated that "[i]n a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution." *Combs*, 205 F.3d at 283. As in *Combs*, in the instant case, "the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination." *Id.*; *see also Ohio v. Leach*, 807 N.E.2d 335, 340-41 (Ohio 2004) (holding "that the use of [defendant's] pre-arrest silence in the state's case-in-chief

---

district court erred in deferring to the state court's finding.

as *substantive* evidence of guilt subverts the policies behind the Fifth Amendment") (emphasis in original).

In this case, the prosecutor's improper statements were "sufficiently flagrant to warrant reversal of [Petitioner's] conviction despite his counsel's failure to object . . . at trial." (Pet. Br. at 39) This Court employs a two-part test to determine whether prosecutorial misconduct warrants a new trial. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994)). "Under this approach, a court must first consider whether the prosecutor's conduct and remarks were improper," and "then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal." *Id.* (citing *Carroll*, 26 F.3d at 1387). The four factors which this Court considers include:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id.* (citing *Carroll*, 26 F.3d at 1385); *see also Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000); *United States v. Collins*, 78 F.3d 1021, 1039 (6th Cir. 1996). "When reviewing challenges to a prosecutor's remarks at trial, [this Court] examine[s] the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error." *Carter*, 236 F.3d at 783 (citing *United States v. Young*, 470 U.S. 1, 11-12 (1985)). If "defense counsel made no objection to the prosecutor's statements at trial, this court will review for plain error only." *Id.* (citing *Collins*, 78 F.3d at 1039). Nevertheless, "prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *Id.* (quoting *Carroll*, 26 F.3d at 1385 n.6).

### 1.        The Prosecutor's Statements Were Prejudicial

"The first [flagrancy] factor focuses on the effect of the improper arguments at issue; namely whether they were misleading or otherwise prejudicial to the defendant." *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002). This Court has found that prosecutorial statements may have a "great[ ] potential for misleading the jury," *Carter*, 236 F.3d at 786, and impacting jury deliberations "because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligations as a representative of a sovereignty," *id.* at 785-86 (quoting *Hofbauer*, 228 F.3d at 700).

Instead of proffering evidence that directly connected Petitioner to his wife's death, the prosecutor told the jury that Petitioner was the "only one person" who could explain his wife's death. The prosecutor's comments were prejudicial because they concerned central issues in the case – namely, how Petitioner's wife allegedly ingested cyanide; how Petitioner allegedly obtained the cyanide; and what Petitioner allegedly said about his wife's death.

Since trial counsel did not object to the statements, the prosecutor was not admonished for the comments. *See, e.g.*, *United States v. Galloway*, 316 F.3d 624, 633 (6th Cir. 2003) (finding that court's admonition expressing specific disapproval of prosecutor's improper comment is sufficient to constitute curative instruction). Although the jury was instructed on Petitioner's Fifth Amendment right, a routine jury instruction at the conclusion of the trial is not sufficient to cure a prosecutor's improper comments. *See, e.g.*, *Carter*, 236 F.3d at 787 (holding that general instruction given at the end of trial, rather than when comments were made, did not cure misconduct). The trial court failed to provide a prompt, curative instruction in response to the highly prejudicial statements. Therefore, we find that there is very strong likelihood that prosecutor's prejudicial statements misled the jury.

### 2.     The Prosecutor's Statements Were Not Isolated

This Court is charged with considering "whether the improper arguments made by the prosecutor were isolated" in nature. *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002). This Court has found that "[i]t only takes a single comment . . . to remind a jury that the defendant has not testified and to fix in the jurors' minds the impermissible inference that the defendant has not testified and to fix in the jurors' minds the impermissible inference that the defendant is guilty merely because of his exercise of that right." *Eberhardt v. Bordenkircher*, 605 F.2d 275, 279 (6th Cir. 1979) (finding that even a "[r]elatively brief and [un]repeated comment" may have prejudicial effect if a judge does not give a strong and timely curative instruction); *see also United States v. Smith*, 500 F.2d 293, 297 (6th Cir. 1974). Thus, while a single improper comment may be sufficient to create a constitutional violation, the frequency and cumulative effect of multiple improper comments magnifies the prejudicial effect of the statements.

In this case, the prosecutor commented on Petitioner's silence three times during closing argument. The multiple statements strongly suggests that Petitioner's silence was a central theme in the prosecutor's closing argument. The comments came in relatively close sequence and were some of the last statements heard by the jury before deliberations. Since the prosecutor's comments were not isolated, the statements had a profoundly prejudicial effect. The multiple statements amplified the prejudicial effect.

### 3.     The Prosecutor's Statements Were Deliberate

This Court also considers whether the prosecutor deliberately placed the improper comments before the jury. *Carter*, 236 F.3d at 790. Petitioner maintains that "[t]he very repetition of the improper comments reveals that such comments were not accidentally placed before the jury." (Pet. Br. at 45) "[R]epeated comments [ ] demonstrate that the errors were not inadvert" because "clearly, we are not dealing with a spontaneous comment that could be regretted but not retracted." *United States v. Smith*, 962 F.2d 923, 935 (9th Cir. 1992). The prosecutor made repeated references to Petitioner's silence and failure to testify in the closing argument. The statements were simply not a response to trial counsel's arguments because trial counsel "never mentioned anything in his opening statement about [Petitioner] testifying or not testifying." (Pet. Br. at 45) As the district court indicated, "the prosecutor intended to comment (especially with regard to the third statement) on [Petitioner's] failure to testify and that the jury likely understood the comments to have been offered for that purpose." (J.A. 1230) (citing *Gall v. Parker*, 231 F.3d 265 (6th Cir. 2000)). Therefore, we find that the prosecutor deliberately placed the statements before the jury.

### 4.     The Strength of the Evidence Against Petitioner Was Not Overwhelming

Last, the Court considers the strength of the evidence against Petitioner to assess the impropriety of the prosecutor's comments. *Carter*, 236 F.3d at 791. In this case, the district court noted that the evidence against Petitioner was not overwhelming. The record shows that Petitioner was out of state when his wife died. The prosecutor also had little, if any, evidence concerning the alleged ingestion of cyanide. More specifically, during the first autopsy, the toxicology test for cyanide did not yield a positive result. Although the second toxicology test yielded a positive result for cyanide, Petitioner's wife did not exhibit physical symptoms of cyanide poisoning. (J.A. 1281-82) The evidence in this case is insufficient to overcome the prosecutor's improper comments. Given the facts in this case, there is a strong likelihood that the prosecutor strategically made the prejudicial statements at the end of the trial to focus the jury's attention on Petitioner's silence, and away from the limited evidence presented at trial. The improper statements in this case constitute flagrant prosecutorial misconduct and are grounds for reversal even if trial counsel did not raise an objection. Therefore, we grant Petitioner's petition for a writ of habeas corpus on the grounds of flagrant prosecutorial misconduct and ineffective assistance of counsel.

**CONCLUSION**

For the foregoing reasons, the district court's decision is **REVERSED**.  We conditionally **GRANT** the writ of habeas corpus petition, and **REMAND** this case to the district court with instructions to order Petitioner's release from custody unless the State of Ohio grants Petitioner a new trial within 180 days.

———————————————

**DISSENT**

———————————————

ALICE M. BATCHELDER, Circuit Judge, dissenting. The majority deems the prosecutor's comments inherently prejudicial and concludes that Girts is entitled to a new trial. I must respectfully disagree.

In a habeas proceeding, a claim of prosecutorial misconduct must be reviewed for harmless error, *Spisak v. Mitchell*, 465 F.3d 684, 713 (6th Cir. 2006) (citations omitted); it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *accord Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc). And this question must be answered on the totality of the circumstances; "taken as a whole and within the context of the entire record." *Lundy v. Campbell*, 888 F.2d 467, 472-73 (6th Cir. 1989). The majority's supposition that the prosecutor's comments were inherently prejudicial, without demonstrable proof of prejudice, is patently wrong.

Prosecutorial misconduct claims are analyzed under a two-step approach, in which the court first determines whether the challenged statements were improper, and if so, determines "whether the impropriety was flagrant and thus warrants reversal." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). Even assuming all three statements were improper — a proposition with which I do not agree — I cannot agree they were flagrant. Flagrancy is measured by four factors: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of evidence against the accused. *Id.*

The most powerful of these factors in this case is the fourth factor: whether the evidence against Girts was strong — the evidence against Girts was overwhelming. Moreover, the prosecutor's comments had no bearing on the theory of the case. Diane Girts died suddenly and unexpectedly from a lethal dose of cyanide, without leaving any evidence of accident or suicide, thus creating a reasonable inference that she had been murdered. Girts had obtained a lethal dose of cyanide prior to Diane's death and had hidden this fact from the police. He had motive for killing her. And, he had offered certain witnesses' inconsistent, contradictory, and incriminating stories, all of which created a reasonable (and powerful) inference that Girts was the murderer.

The prosecution's statement regarding Girts's pre-arrest secrecy in not telling the police about his purchasing cyanide is not even a Fifth Amendment issue, it is part of the prosecution's theory of the case, insomuch as Girts — prior to any arrest or Miranda warning — withheld information critical to the police investigation. The statement regarding the government-witness-testimony's being unrefuted is not improper either, it is merely a summary of the evidence. The statement that only Girts could explain how the cyanide got into Diane's system, however, could be interpreted as a comment on Girts's decision not to testify at trial. But if this statement had any effect on the jury at all — and I do not believe that it did — then the only reasonable conclusion from the totality of the evidence is that the effect was minimal. There is no basis to conclude that, but for this statement, the jury's decision would have been different.

The district court should be affirmed.