**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0107n.06

**No. 09-1250**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Feb 14, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DON PERKINS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| KENNETH T. McKEE, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: BOGGS, MOORE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. After a state court jury convicted Don Perkins of two counts of

first-degree murder and imposed a life sentence, he filed a petition for a writ of habeas corpus. The

district court denied the petition and granted a certificate of appealability on three issues: (1)

whether the trial court impaired his right to present a complete defense; (2) whether prosecutorial

misconduct violated his right to a fair trial; and (3) whether counsel provided ineffective assistance.

We affirm.

I.

Late in the night spanning October 15 and 16, 2001, Damon Hill, Antonio Hall and Maurice

Odums drove to Hall's girlfriend's residence at 14181 Spring Garden Street. After parking, they

walked to the back of the residence where three men with guns surprised them. The gunmen pointed their handguns at the trio. No one moved for thirty or forty seconds. When Odums heard a gunshot, he ran through the backyard and down an alley toward an intersection, where he saw police. He ran to the police car and told the officers that "some guys was just shooting at me in the back yard." R.11-5 at 116.

Corey Scales emerged from the alley. The officers arrested Scales, after which they proceeded down the alley until they discovered the bodies of Hall and Hill at the driveway for 14181 Spring Garden Street. Each had suffered a single gunshot wound to the head.

When Sergeant Eric Decker arrived, he stood near the officers' squad car, where Scales was detained in the back seat. A white Chevrolet Caprice drove by, slowing as it approached the police car. As the vehicle passed, Scales pressed his face against the squad car's backseat window, seemingly (according to Sergeant Decker) trying to communicate to the car's occupants. Decker pointed his flashlight at the Caprice and ordered the driver to stop the car, but the driver kept moving.

Officers in two other cars pursued the vehicle. The car eventually slowed down and a passenger, Anthony Patton, exited. The driver, Don Perkins, stopped, and the officers arrested him. On October 16, Maurice Odums identified Don Perkins in a police lineup as one of the gunmen at 14181 Spring Garden Street.

A grand jury charged Perkins with two counts of premeditated murder, two counts of felony murder, one count of armed robbery, one count of assault with intent to commit murder, one count of being a felon in possession of a firearm, and one count of possession of a firearm during the commission of a felony. At trial Perkins denied any involvement in the murders. He testified that he had been at a wake until approximately 10:40 PM on the night of the murders. The only reason he was in the neighborhood, he said, was to pick up Lena Nixon, a woman he had been dating, at a nearby bus stop. A jury convicted Perkins on all counts and sentenced him to life in prison for the murder convictions.

The Michigan Court of Appeals affirmed his conviction, and the Michigan Supreme Court denied leave to appeal. The district court rejected his habeas petition and granted a certificate of appealability on three issues: (1) whether the trial court impaired his right to present a complete defense; (2) whether prosecutorial misconduct violated his right to a fair trial; and (3) whether counsel provided ineffective assistance.

## II.

Perkins filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act. We therefore may grant the writ with respect to claims "adjudicated on the merits in State court proceedings" only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of" clearly established Supreme Court precedent or "resulted in a decision based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

III.

Perkins first claims that the state trial court violated his right to present a complete defense when it refused to allow him to call the officer who took Maurice Odums' statement on the night of the murders. After the State rested, Perkins called Sergeant Christopher Quarello to testify about a statement that Maurice Odums gave to the police on the night of the murders. In the statement, Odums described Perkins as about 5'6" tall, even though he is about six feet tall. Defense counsel thought this testimony would undermine Odums' identification.

But as it turned out, Officer Fisher, not Sergeant Quarello, had taken Odums' statement, and Fisher was not on the witness list. When counsel realized the problem, he tried to call Officer Fisher to the stand. The court denied the request because Perkins had not put Officer Fisher on the witness list, it did not want to delay the proceedings and Fisher's testimony would have repeated Odums' earlier testimony. The Michigan court of appeals agreed that Perkins' request to produce Officer Fisher would have "delayed the trial considerably" and that Officer Fisher's testimony would have touched on matters that were "already covered in detail at trial." R.11-13 at 3. It therefore held that the trial court did not abuse its discretion in denying Perkins' request to produce Officer Fisher.

This decision did not unreasonably apply Supreme Court precedent. Criminal defendants enjoy a Sixth and Fourteenth Amendment right to present evidence, but that right "is subject to reasonable restrictions," including reasonable restrictions on the admission of evidence at a trial. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). So long as judges rely on evidentiary and local

rules of general applicability that are not "arbitrary or disproportionate to the purposes they are designed to serve," the judges may enforce these rules. *Id.* (internal quotation marks omitted). Trial judges also have "wide discretion" to refuse to admit testimony that would be "merely cumulative in nature." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 230 (1940).

Under Michigan law, criminal defendants must disclose to the prosecutor the names and addresses of all witnesses they plan to call at trial. Mich. Ct. R. 6.201(A)(1); Mich. Comp. Laws § 767.94a(1)(a). Defendants may add other witnesses during trial only with the court's permission. M.C.R. 6.201(F), (I); M.C.L. § 767.94a(2)–(3).

Perkins wisely does not challenge the Michigan rule itself, which is neither arbitrary nor disproportionate to its purposes because, without it, no lawyer could prepare for trial. *Cf. Taylor v. Illinois*, 484 U.S. 400, 401–02 (1988). Perkins instead challenges the trial court's application of the rule. He notes that, because the prosecuting attorney removed Fisher from the witness list, "any blame for the delay should" lie with the State. Perkins Br. at 11, 12. But nothing in the record tells us who removed the Fisher from the witness list. The prosecutor acknowledged that Officer Fisher "was removed from the witness list," R.11-8 at 8, but did not say who took him off the list. Nor did anyone else. Nor for that matter is it clear that, even if the prosecutor had initially placed Fisher on *its* witness list, this would alleviate defense counsel's obligation to prepare his own accurate witness list. On this record, we cannot say that the state trial court unreasonably found that Perkins was responsible for Fisher's absence from the list.

Even so, Perkins adds, Fisher's testimony "went to the very heart of this case" and would have "create[d] a reasonable doubt that otherwise would not exist," and thus any witness-list errors should have been excused. Perkins Br. at 12, 13. Yet the state courts held that this testimony was cumulative, and reasonably so. At this point in the trial, the jury had already heard from Maurice Odums about his witness statements to police and about any inconsistencies between that testimony and his testimony in another trial. The prosecutor and Odums engaged in a long colloquy about his description of Perkins to officers, including his estimate that Perkins was "maybe six feet tall." R.11-5 at 119. Defense counsel then attempted to undermine Odums' identification testimony. He asked about Odums' prior testimony in Corey Scales' trial, including a statement in which Odums described Perkins as "[t]he small guy," R.11-6 at 40, all as part of a series of questions designed to show inconsistencies between Odums' testimony at Perkins' trial and his testimony in Corey Scales' trial. Although Odums never specifically said Perkins was 5'6" tall, as opposed to saying he was "[t]he small guy," the state court's conclusion that any inconsistencies in Odums' testimony had "already been brought out" was a reasonable one. R.11-8 at 10.

## IV.

Perkins next claims that the state courts violated his constitutional rights, primarily it appears his rights under the Compulsory Process Clause, with respect to how they treated his efforts to call Lena Nixon as a witness. Here, too, he is mistaken.

Perkins identified Nixon as an alibi witness and sought to produce her at trial, but she managed to avoid service of a witness subpoena. In response, Perkins asked to call the process server, the individual who tried to serve the subpoena, as a witness. The trial court rejected the request because the process server could not say anything about Nixon's testimony, only what the individual had done to try to serve her. That was a reasonable decision. The Compulsory Process Clause does not require courts to admit irrelevant evidence. *Crane v. Kentucky*, 476 U.S. 683, 689–90 (1986). Because the process server could not have testified about what Nixon would have said, but only how he had tried to serve her, the trial court had no obligation to permit the testimony.

To the extent Perkins means to argue that the trial court refused to subpoena Nixon, that does not help him. Perkins offers no evidence that the trial court refused to issue the subpoena, and nothing in the record supports the idea. To the contrary: Perkins' efforts to call the process server as a witness suggest that the court indeed issued a subpoena but that Nixon could not be found.

To the extent Perkins means to argue that the trial court should have offered additional assistance in locating and producing Nixon, that contention goes nowhere. The Michigan court of appeals held that, as a matter of Michigan evidence law, Perkins did not seek additional assistance until it was too late. *See* M.C.L. § 767.40a(5). A state court's application of its own evidentiary rules, unless fundamentally unfair, does not violate the U.S. Constitution. *Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010). That was not the case here.

V.

Perkins complains that his counsel provided ineffective assistance by failing (1) to object to "the many instances of prosecutorial misconduct," (2) to move to suppress the lineup in which Odums identified Perkins and (3) to present "an expert witness on the inherent problems with eyewitness testimony." Perkins Br. at 24–25. Constitutionally ineffective assistance exists when "counsel's performance was deficient" and the "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is constitutionally deficient when it falls "below an objective standard of reasonableness." *Id*. at 688. Our analysis is "highly deferential" and we "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id*. at 689. Deficient performance prejudices the defense when "there is a reasonable probability" that "the result of the proceeding would have been different." *Id.* at 694. Because the Michigan court of appeals reviewed Perkins' ineffective-assistance claim on the merits, we give the state court's adjudication AEDPA deference. *See* 28 U.S.C. § 2254(d). The Supreme Court recently emphasized the double dose of deference that federal courts must give state courts in reviewing *Strickland* claims under AEDPA:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. . . . An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When

> § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786–88 (2011).

## A.

*Disparaging comments*. Perkins' main argument goes to his counsel's failure to object to disparaging comments by the prosecutor. Two inquiries guide whether a prosecutor's misconduct warrants a new trial and whether, for present purposes, a reasonable attorney would have objected to the conduct. One, we ask whether "the prosecutor's conduct and remarks were improper." *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). Two, if the comments were improper, we ask "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 2002)); *see Darden v. Wainwright*, 477 U.S. 168 (1986); *United States v. Young*, 470 U.S. 1 (1985). At issue then is whether the prosecutor's conduct rose to this level, whether as a result Perkins' counsel should have objected and whether any failure to object prejudiced Perkins.

## 1.

*Prosecutorial misconduct—opening statement. First*, the prosecutor noted in his opening statement that Corey Scales' "case has already been disposed of," R.11-5 at 70, a reference that

became unfair, Perkins says, when the prosecutor elicited testimony from Odums that he had testified at Scales' trial. The "clear implication" from this part of the opening statement and Odums' testimony, as Perkins sees it, is that Odums must be a credible witness because he testified at the trial of a defendant whose case had "already been disposed of." Perkins Br. at 16.

But this argument piles one unwarranted assumption on another. Assumption one: when the prosecutor said that Scales' case had been disposed of, he implied Scales had been convicted at his trial. Assumption two: because Maurice Odums had testified for the State in a trial where the jury convicted the defendant, Odums must be a reliable witness. Assumption three: that a jury would connect the two inferences, even though they do not specifically reference one other or for that matter say what Perkins suggests they say. Each assumption is unnecessary, and the risk that all three would be made by the jury is an attenuated one. A court can "dispose of" a criminal defendant's case with a conviction, an acquittal or in some circumstances a mistrial. The prosecutor's comment in his opening statement elevates none of those meanings over the others. Odums' statement that he testified at Scales' trial thus tells the jury little. And the reality that the prosecutor made the two statements at different times, roughly an hour or two apart, weakens further the risk that any such inferences would be drawn. The Michigan court of appeals reasonably determined that Perkins was not prejudiced by his counsel's failure to object.

*Second*, the prosecutor said in his opening statement that Maurice Odums "passed the gold standard test, going to a line-up and choosing the right man, that is Don Perkins." R.11-5 at 81–82. The district court acknowledged that "[t]his remark would have been better suited to closing

arguments," but that ultimately it "could not have prejudiced Petitioner, given the strength of evidence against him and the trial court's instruction that the attorneys' opening statements were not evidence." R.11-13 at 10. We agree. The remark was fleeting, relatively mild and indeed could have been made in the same trial, albeit during closing argument. At a minimum, and as the Michigan court of appeals concluded, defense counsel's failure to object to it was not prejudicial. *See Byrd v. Collins*, 209 F.3d 486, 537–38 (6th Cir. 2000).

2.

*Cross-examination.* Perkins argues that his counsel should have objected when the prosecutor asked Perkins whether he could "think of any reason" that Sergeant Decker would lie when he said he had ordered Perkins to stop his car on the night of the crime. R.11-9 at 124. Under Michigan law, "it [is] improper for a witness to comment or provide an opinion on the credibility of another witness since matters of credibility are to be determined by the trier of fact." *People v. Buckey*, 378 N.W.2d 432, 439–40 (Mich. 1985). But the risk of prejudice here is slender. Whether Decker asked Perkins to stop was a peripheral point, and the fact that the *defendant* was given an opportunity to comment on Decker's credibility holds little risk of prejudice to Perkins.

3.

*Disparaging defense counsel. First*, Perkins says that his counsel should have objected when the prosecutor noted in his opening statement that "maybe [defense counsel] is not thankful for" the jurors' service, but that "we know that you made a sacrifice to be here." R.11-5 at 62. This kind of

shameless effort to ingratiate oneself to a jury may be in bad taste and may give lawyers a bad name. But there are tactical reasons for declining to object (remaining above the fray) and a remedy to boot (disproving the suggestion by thanking the jurors in his opening statement, which defense counsel did). "[T]rial counsel's tactical decisions are particularly difficult to attack," *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994), and choosing whether and when to object to such posturing is classically one that should not be upset by a federal court on collateral review.

*Second*, Perkins says that the prosecutor "implied that [defense] counsel was either a liar or incompetent by saying in front of the jury that he showed him an exhibit during lunch hour, knowing that he did not." Perkins Br. at 17. On the third day of trial, the prosecutor represented that he had shown an exhibit to defense counsel during the lunch hour. Defense counsel responded that he "was down on the third floor during lunch hour," suggesting he had not seen the exhibit. R.11-9 at 182. At that point, the prosecutor showed counsel the exhibit and explained that he had shared it with him as the jury left for lunch. The record supports the prosecutor's statements. Just before the court adjourned at mid-day, the prosecutor told the court, with defense counsel there, about the exhibit. The prosecutor at any rate did not say that defense counsel was "a liar or incompetent" but merely said (accurately) what had happened.

*Third*, Perkins complains about disparaging comments the prosecutor made in his rebuttal argument, namely that defense counsel "knows how to cast an aspersion on somebody," that he was a "wolf in sheep's clothing," that he was "a guy who represents a criminal," that his "character is known" and that he was paid to represent Perkins. R.11-11 at 67–70, 72, 74. The tit-for-tat

gamesmanship exemplified by these comments and by the remarks of defense counsel that preceded them brings no credit to the bar and gives trial judges gray hair. But the Michigan court of appeals nevertheless reasonably concluded that defense counsel's failure to object did not violate the Sixth Amendment.

The key problem with Perkins' claim is that the prosecutor's rebuttal remarks did not arise in a vacuum. Before the prosecutor gave his rebuttal argument, Perkins' counsel engaged in borderline conduct of his own during his closing argument. Defense counsel was a former professional football player, and in his argument he recounted "the two percent" of football players who would play "the illegal game," "[h]it you out of bounds" and otherwise play dirty. R.11-10 at 57. Just as the football arena reveals character, trying a case "demonstrates your character. Believe me," he said, "if you want to see somebody's character, just come to court." R.11-10 at 57.

All of this was prelude to defense counsel's direct and implied attacks on the character of the prosecutor and the State's witnesses. He twice referred to the "two percent" in describing the State's case, its lawyer and its witnesses. R.11-11 at 63. He directly accused one police officer who had testified for the prosecution of being "a sacrificial liar" and of testifying "untruthfully." R.11-10 at 57. And he called another State's witness "an angel" who "never tells a lie," mocking the idea that he was telling the truth: "Think about those little costumes they have at Christmas time, they put wings on them, and they put that little halo thing that go around them, the white halo. That's what we need to put on Sgt. Wilson. He never tells a lie. I've got some other initials I'd put for him, but I won't say that." R.11-11 at 62.

Context matters. The prosecution's rebuttal followed on the heels of the defense closing, and not surprisingly it sought to rebut the charges. The prosecutor noted that Perkins' counsel, "through his entire comments to" the jury, "[wa]s essentially scandalizing pretty much everybody in the case," "cast[ing] aspersions" and "attack[ing] essentially everybody in the case." R.11-11 at 67–68. Only then did the prosecutor call Perkins' counsel "the wolf in sheep's clothing" based apparently on the soft-spoken way in which counsel delivered his criticisms of the State's witnesses. R.11-11 at 67. Only then did he say that defense counsel's "character is known." R.11-11 at 68. And only then did he repeatedly mention that defense counsel was paid to represent Perkins. When "objectionable content was invited by or was responsive to the opening summation of the defense," that may "not . . . excuse improper comments," but it does help "to determine their effect on the trial as a whole." *Darden*, 477 U.S. at 182. Unlike unprovoked comments, these back-and-forth remarks arose in verbal surroundings that lessened the risk of prejudice to either party.

How in this setting, moreover, would a trial court have responded to an objection by defense counsel? The two most likely possibilities are these. One is an outright overruling on the ground that what is sauce for the goose is sauce for the gander, with the trial court telling defense counsel in open court that he cannot expect to launch an aggressive attack on the character of the State's witnesses and the prosecutor without incurring incoming fire on rebuttal. The other possibility is an admonition to the prosecution to tone it down while again reminding defense counsel that he engaged in the same kind of conduct and the prosecution is allowed to respond in kind. The risk of

prejudice in these scenarios runs in the direction of Perkins if his counsel objected and away from Perkins if he does not.

The prosecutor's remarks also were isolated. *See Carroll*, 26 F.3d at 1385. He made one potentially improper comment during his opening statement—the remark that Maurice Odums "passed the gold standard test" when he identified Don Perkins in a line-up, R.11-5 at 81–82—and made a few borderline comments during his rebuttal argument, all in response to comments by defense counsel. Even when the prosecutor made these comments, context shows that they were not part of a larger, deliberative strategy to discredit defense counsel. *See Carroll*, 26 F.3d at 1385. They were "off-hand remark[s] in a heated trial," triggered by defense counsel's charges against the prosecutor and the State's witnesses, as opposed to previously "select[ed] inappropriate arguments . . . use[d] . . . repeatedly during summation." *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005).

The prosecutor's comments also did not bear on the key issues in the case and had little possibility of affecting a jury verdict that rested on ample evidence. *See Carroll*, 26 F.3d at 1385. Maurice Odums identified Perkins as one of the assailants in a line-up within 24 hours of the crime and did the same at trial. Police found Perkins near the scene of the crime soon after the shootings. And when a police sergeant ordered him to stop his car, Perkins sped away and continued to drive after two other police cars gave chase. At trial, Perkins admitted to being near the scene of the crime and that he did not stop his car despite the officers' pursuit. The key piece of evidence was Maurice Odums' identification testimony. Yet the prosecutor's alleged misconduct had nothing to do with Odums. The prosecutor's comments did not improperly inflate Odums' testimony, and they did not

improperly diminish competing testimony. They were directed at defense counsel, who had just accused several state witnesses of lying and attacked the character of the prosecutor. The Michigan court of appeals reasonably held that failure to object in this setting does not establish a cognizable ineffective-assistance claim.

4.

*Unsworn Testimony.* Perkins argues that the prosecutor gave unsworn testimony in his closing argument. "It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any purported facts that are not in evidence and are prejudicial . . . . However, prosecutors must be given leeway to argue reasonable inferences from the evidence." *Byrd*, 209 F.3d at 535.

*First*, the prosecutor made two comments suggesting that Anthony Patton could have been the third gunman: (1) When referring to the men who ambushed Hall, Hill and Odums in the backyard of 14181 Spring Garden Street, the prosecutor said that "a third person who's never identified" "might be Anthony Patton," R.11-10 at 15; and (2) When referring to the same men, he said, "That's three guys; Corey Scales, Don Perkins, the unknown person, eventually, supposedly is Mr. Patton." R.11-10 at 35. This was a reasonable inference to draw from the evidence. Patton's testimony corroborated Perkins' testimony. And when the prosecution fairly challenged the truthfulness of Perkins' testimony, the necessary implication was that Patton had lied as well. Nor, it bears adding, did the prosecutor affirmatively declare that Patton had been the third gunman. He

used qualifying language—"might be" and "supposedly"—to draw a fair inference that the man riding along with Perkins after the shootings might be the third triggerman. It is unclear at all events how these remarks prejudiced Perkins, as he offers no theory of prejudice on this score.

*Second*, the prosecutor said that the backyard at 14181 Spring Garden Street was "lit up . . . by a floodlight," R.11-10 at 15–16, which allegedly was contrary to the evidence. Yet several witnesses testified about the light in the backyard. R.11-5 at 108–09 (Odums); R.11-6 at 19–20 (Odums); R.11-6 at 82–83 (Officer William Niarhos); R.11-6 at 87 (Officer Niarhos, describing a "floodlight"); R.11-6 at 103–04 (Tiffany Hopkins). No doubt there was some testimony to the contrary, but the prosecutor (like defense counsel) may use the evidence favoring it during argument.

*Third*, the prosecutor said that, when Perkins drove by the squad car containing Corey Scales, it was a "classic" instance of a defendant "returning to the scene of the crime," a statement Perkins decries because there was no foundation that those who commit crimes return shortly to the scene of the crime. R.11-10 at 19. But this was a permissible inference to draw from the evidence, giving counsel a reasonable basis for not objecting to it.

*Fourth*, Perkins says that the prosecutor unconstitutionally shifted the burden of proof when he noted that Lena Nixon had not testified and had not corroborated his alibi defense. But while a prosecutor may not comment on a defendant's silence, "a prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the government's case" so long as the prosecutor does not suggest that the defendant bears the burden of proof. *United States v. Clark*, 982 F.2d 965,

968–69 (6th Cir. 1993). The prosecutor did not say or suggest that Perkins bears the burden of proof. He started his remarks by saying that, faced with the State's evidence, "if you're sitting with Mr. Perkins" you may want to "produce some witnesses that are going to put you somewhere else." R.11-10 at 28. To do that, you put on "alibi witnesses." R.11-10 at 29. But Ms. "Nixon wasn't one of those witnesses, and that's the first thing that I think you begin your analysis on." R.11-10 at 29. He thus did not say that Perkins bore the burden of proving his innocence; he said that the failure to produce Lena Nixon undermined his alibi.

B.

*Police Lineup.* Perkins says that defense counsel provided ineffective assistance when he failed to challenge the lineup in which Odums identified Perkins. Only if an "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" is there a cognizable challenge to a lineup. *Simmons v. United States*, 390 U.S. 377, 384 (1968). Perkins' problem is that he offers no reason why his counsel underperformed in refusing to object to the lineup. He offers no evidence that the identification procedure was impermissibly suggestive. And the risk of misidentification was small in view of Odums' testimony that he identified Perkins in the lineup because "[h]e was familiar" with him. R.11-6 at 54–55.

C.

*Eyewitness Testimony.* Also unavailing is Perkins' claim that his attorney should have called an expert witness to testify about the "inherent problems with eyewitness testimony." Perkins Br. at 25. The Constitution does not require defense counsel to pursue every trial strategy imaginable, whether likely to bear fruit or not. *See Engle v. Isaac*, 456 U.S. 107, 134 (1982). No precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment. And there is nothing about this case suggesting that such a witness was imperative here.

VI.

For these reasons, we affirm.

No. 09-1250
*Perkins v. McKee*

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I respectfully dissent and would grant the petition for a writ of habeas corpus with respect to Perkins's claim that defense counsel was ineffective for failing to object to the prosecutor's repeated references to Perkins's "paid" defense counsel during rebuttal closing arguments.[1]

The state court addressed Perkins's ineffective-assistance-of-counsel claim. *Michigan v. Perkins*, No. 250159, 2004 WL 2535107, at *7–8 (Mich. Ct. App. Nov. 9, 2004). Thus, "because the AEDPA applies to [Perkins's] petition, we can only consider [his] challenge within the more limited assessment of whether the state court's application of *Strickland* to the facts of this case was objectively unreasonable." *Washington v. Hofbauer*, 228 F.3d 689, 702 (6th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 408–09 (2000)). With respect to Perkins's claim that his counsel was ineffective for failing to object to the prosecutor's improper comments denigrating defense counsel,[2] the state court relied on its conclusion regarding the underlying prosecutorial-misconduct claim—that Perkins "was not so prejudiced by these comments that he was denied a fair trial"—to

---

[1]Perkins raised a separate prosecutorial-misconduct claim but admits that the claim is procedurally defaulted because counsel did not object to the prosecutor's comments at trial. He argues that his claim of ineffective assistance of counsel for failure to object constitutes cause and prejudice to overcome the procedural default. *See, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 757–58 (6th Cir. 2007), *cert. denied*, 129 S. Ct. 92 (2008); *Washington v. Hofbauer*, 228 F.3d 689, 708 (6th Cir. 2000).

[2]There is no question that the prosecutor's statements attacking defense counsel were improper. *Perkins*, 2004 WL 2535107, at *5 ("We conclude that these comments improperly attacked the credibility of defense counsel and implied that defense counsel did not believe his own client, and was only making his arguments because defendant paid him.").

conclude that "defense counsel's failure to object to these comments did not amount to ineffective assistance of counsel." *Perkins*, 2004 WL 2535107, at *7.

I conclude, however, that the state court's analysis of prejudice resulting from the prosecutor's misconduct is an unreasonable application of clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Specifically, it was unreasonable for the state court to conclude that Perkins was not prejudiced by the prosecutor's improper comments because the comments directly implicated Perkins's Sixth Amendment right to counsel.

The prosecutor's arguments amounted to repeated accusations that defense counsel was lying simply because he was paid to represent Perkins. The prosecutor said:

> . . . . This is a guy who represents a criminal, okay.
>
> . . . .
>
> But when you talk about, you know, when is Mr. Mann ever going to get up and say, "Well, you know what? They got my guy?" You know. That's his lawyer. His obligation flows to one person, Don Perkins. Okay.
>
> . . . .
>
> . . . . Now, what Bob Mann does is, he's a paid lawyer to come in for Don Perkins. And he's up here vouching for him.

R.11 (Trial Tr., Vol. IV, at 68–69). The prosecutor referred to the fact that Mann was Perkins's "paid" attorney five additional times in his rebuttal, *id.* at 69–74, and repeatedly made statements tying the defense's arguments to defense counsel Mann. *See, e.g.*, *id.* at 73 ("[W]hen you listen to his comments on behalf of his client . . . ."); *id.* at 75 ("It's offered to you by Mr. Perkins' lawyer.").

- 21 -

Much of the prosecutor's rebuttal, in fact, was directed towards defense counsel personally. *See, e.g.*, *id.* at 75–76 ("Now, if they had guns, Mr. Mann, where are the guns?"); *id.* at 77–78 ("If that's the case, Mr. Mann, you know, why isn't he [told to identify] Anthony Patton?").

In its review of habeas claims for prosecutorial misconduct, the Supreme Court has distinguished misconduct that implicates a constitutional right. *Darden v. Wainwright*, 477 U.S. 168, 181–82 (1986) ("The prosecutors' argument did not . . . implicate other specific rights of the accused *such as the right to counsel* or the right to remain silent." (emphasis added)); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("This is not a case in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights, such as the right to counsel, *Argersinger v. Hamlin*, 407 U.S. 25 (1972), or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right. *Griffin v. California*, 380 U.S. 609 (1965)."). "When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly*, 416 U.S. at 643.

"[T]he right to be represented by counsel is among the most fundamental of rights." *Penson v. Ohio*, 488 U.S. 75, 84 (1988); *see also United States v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980) ("The right to counsel is so basic to all other rights that it must be accorded very careful treatment. Obvious and insidious attacks on the exercise of this constitutional right are antithetical to the concept of a fair trial . . . ."). Accordingly, "[n]o prosecutor may employ language which denigrates the right of a criminal defendant to retain the counsel of his choice, or otherwise limits

the fundamental due process right of an accused to present a vigorous defense." *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990).

The Ninth Circuit, in granting a writ of habeas corpus under pre-AEDPA standards, discussed the prejudice that results from a prosecutor's attacks on a defendant's constitutional right to counsel:

> At the outset, we feel it incumbent on us to note that in no situation in a criminal trial such as this one do we feel the mere act of hiring an attorney is probative in the least of the guilt or innocence of defendants. Lawyers in criminal cases are necessities not luxuries, and even the most innocent individuals do well to retain counsel. Neither is it accurate to state that defense counsel, in general, act in underhanded and unethical ways, and absent specific evidence in the record, no particular defense counsel can be maligned. Even though such prosecutorial expressions of belief are only intended ultimately to impute guilt to the accused, not only are they invalid for that purpose, they also severely damage an accused's opportunity to present his case before the jury. It therefore is an impermissible strike at the very fundamental due process protections that the Fourteenth Amendment has made applicable to ensure an inherent fairness in our adversarial system of criminal justice. Furthermore, such tactics unquestionably tarnish the badge of evenhandedness and fairness that normally marks our system of justice and we readily presume because the principle is so fundamental that all attorneys are cognizant of it. Any abridgment of its sanctity therefore seems particularly unacceptable.

*Bruno v. Rushen*, 721 F.2d 1193, 1194–95 (9th Cir. 1983) (internal quotation marks and citations omitted), *cert. denied*, 469 U.S. 920 (1984).

The prosecutor also effectively "conveyed to the jury a fundamental misconception of the role of defense counsel." *United States v. Friedman*, 909 F.2d 705, 708–09 (2d Cir. 1990) (reversing conviction on direct appeal because of prosecutor's improper statements—including, *inter alia*, that

defense counsel "try to get [defendants] off, perhaps even for high fees" and that defense counsel "will make any argument he can to get that guy off"). In stating that defense counsel's "obligation flows to one person, Don Perkins," R.11 (Trial Tr., Vol. IV, at 68), the prosecutor misled the jury regarding the basic principle of professional responsibility that an attorney has an obligation not only to his client but also to the court. *See* MODEL RULES OF PROF'L CONDUCT 3.3 (Candor Toward the Tribunal).

The prosecutor exacerbated the prejudice of his misconduct by indicating that he has a personal history with defense counsel: "And make no mistake about it, Mr. Mann's been doing this a long time." R.11 (Trial Tr., Vol. IV at 67); "We's [sic] tried cases before. This isn't the first time our paths have crossed." *Id.* at 68. "[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935). Further, in repeatedly addressing defense counsel personally throughout rebuttal, the prosecutor "encourage[d] the jury to focus on the conduct and role of [defense counsel] rather than on the evidence of [the defendant's] guilt." *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005).

The majority points out that the prosecutor's comments were not related to the key evidence of Odums's identification of Perkins and were limited to the rebuttal portion of the prosecution's closing argument. But improper comments striking at a defendant's right to counsel necessarily strikes at the heart of the case and permeates the entire trial. It is through his attorney that Perkins

tests the government's evidence at trial, which is one reason why the right to counsel is so fundamental in our adversarial system of justice. *See Penson*, 488 U.S. at 84. The prosecutor's repeated references to "paid" defense counsel—made during the last argument heard by the jury before deliberations—prejudiced Perkins by impairing his ability to present a defense to the jury. *See Bruno*, 721 F.2d at 1195.

To be sure, defense counsel delivered his own attacks on the prosecution and their witnesses during his closing argument, which is relevant "to determine the[] effect [of the prosecutor's improper comments] on the trial as a whole." *Darden*, 477 U.S. at 182 (citing *United States v. Young*, 470 U.S. 1 (1985)). Accordingly, this court has distinguished between personal attacks on defense counsel and statements about counsel based on "a reasonable inference to be drawn from defense counsel's presentation of evidence and argument." *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001). "'Where there is conflicting testimony, it may be reasonable to infer and accordingly to argue, that one of the two sides is lying.'" *Id.* at 536 (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir.), *cert. denied*, 519 U.S. 872 (1996)). Thus, commentary on defense counsel's credibility based on defense counsel's presentation of the evidence or argument was warranted; commentary on defense counsel's credibility based simply on the fact that Perkins paid counsel to represent him, however, was constitutionally impermissible.

Because the prosecutor's repeated references to Perkins's paid defense counsel directly implicated Perkins's Sixth Amendment right to counsel, it was unreasonable for the state court to

conclude that counsel was not ineffective for failing to object. Even if defense counsel did not want to risk receiving rebuke in front of the jury for his own conduct in closing, "[a]t the very least," counsel should ask for a bench conference out of the hearing of the jury to request an appropriate instruction. *Young*, 470 U.S. at 13. If defense counsel had asked for an appropriate instruction, "the jury would have heard from the judge that the prosecutor's comments called for an improper and impermissible negative inference for [Perkins's] exercise of his [Sixth] Amendment rights." *Girts v. Yanai*, 501 F.3d 743, 757 (6th Cir. 2007), *cert. denied*, 129 S. Ct. 92 (2008). Furthermore, allowing the prosecutor to attack his client's exercise of the Sixth Amendment right to counsel "cannot be characterized as litigation strategy." *Id.*; *accord Hodge v. Hurley*, 426 F.3d 368, 386 (6th Cir. 2005). Therefore, it was unreasonable for the state court to conclude that defense counsel's failure to object—his failure to do anything to attempt to cure the prejudice of the repeated comments—did not amount to ineffective assistance of counsel.

Finally, this is not a case in which it is reasonable to conclude that the failure to cure such prejudicial comments implicating Perkins's fundamental Sixth Amendment right to counsel does not "undermine confidence in the outcome" of the trial. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The evidence against Perkins was not "overwhelming," *Darden*, 477 U.S. at 182; rather, the case hinged on one witness's identification of Perkins. Perhaps nothing better demonstrates the "reasonable probability that, but for counsel's [ineffectiveness], the result of the [trial] would have been different," *Strickland*, 466 U.S. at 694, than the fact that Perkins's first trial resulted in a hung

jury.  R.11-2 (State Court Docket at 6); *cf. Sizemore*, 921 F.2d at 671 (noting that the defendant's first trial resulted in a hung jury as evidence that the proof of guilt was not overwhelming).

Accordingly, I would reverse the district court's judgment and grant the petition for a writ of habeas corpus on Perkins's claim that his counsel was ineffective for failing to object to the prosecutor's repeated denigration of defense counsel's credibility on the basis that he was "paid" to represent Perkins.  I respectfully dissent.