NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0219n.06

No. 24-1193

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | FILED |
| Plaintiff-Appellee | ) ) | Apr 25, 2025 |
|  | ) | KELLY L. STEPHENS, Clerk |

UNITED STATES OF AMERICA,

    Plaintiff-Appellee

v.

MARCUS SMITH,

    Defendant-Appellant

)
)
)
)
)
)
)
)
)
)

**FILED**

Apr 25, 2025

KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: GIBBONS, WHITE, and MURPHY, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Marcus Smith appeals his conviction of knowingly possessing a firearm and/or ammunition while a felon, in violation of 18 U.S.C. § 922(g)(1), arguing that his trial counsel was ineffective, the jury instructions were erroneous, and the government did not prove the interstate element of the felon-in-possession charge beyond a reasonable doubt. We AFFIRM.

## I. Background

## A. Pre-Trial

In February 2022, a grand jury indicted Smith on one count of being a felon in knowing possession of a firearm and ammunition on or about October 31, 2018. On March 7, 2023, while Smith was detained pending trial, government witness Yolanda James told Task Force Officer Diana Napier that "Smith tried to send a message to her from an old neighbor named Charlene Lee." R. 69-4, PID 781. As summarized in Napier's report, when Napier called Lee, Lee said that Smith told her that James "needs to tell the attorneys the truth to what really happened." *Id.*

Lee also told Napier that "when [James] lived down the street on Evanston, it was always stuff happening down there," and that she heard about an argument with Smith "on the [F]ourth of July when the shots was allegedly fired." *Id.* Lee also told Napier that James "told her that [Smith] did not have a gun and that it's on him and the attorneys." *Id.* The government provided a copy of Napier's report and Lee's contact information to Smith's counsel before trial.

### B. Trial

A felon-in-possession charge has four elements: (1) the defendant's status as a felon, (2) his knowledge of that status, and (3) his knowing possession of a firearm and/or ammunition (4) that traveled in interstate commerce. *United States v. Ward*, 957 F.3d 691, 696 (6th Cir. 2020); 18 U.S.C. § 922(g)(1). The parties stipulated that Smith had a prior felony conviction, and that he knew about his conviction.

The relevant trial testimony was as follows. At the time of the events giving rise to this case, Smith and James were separated but "trying to reconcile [their] relationship." R. 64, PID 560. While they worked on their relationship, Smith and James lived together at James's house. At that time, James's friend Ronald Johnson was helping James while she received cancer treatment and regularly picked James and her son up to drop James's son off at school.

Johnson testified that when he arrived at James's house the morning of October 31, 2018, James did not come out to the car immediately. While Johnson was waiting, Smith—whose presence was unexpected, and whose son Johnson had not been taking to school—came out of the house and told Johnson he needed to arrive at the house earlier to get Smith's son to school on time. After Johnson told Smith to discuss the matter with James, Smith returned to the house, came back out carrying a "black Glock," and fired a shot "toward the sky in front of the vehicle." *Id.* at PID 520–21, 526. James then came outside, asked Smith what was wrong with him, and

began hitting him. After Smith went back inside, James and her son got in the car with Johnson and left.

Although James's testimony largely echoed Johnson's, some details differed. According to James, Smith was "agitated because Mr. Johnson had [her] vehicle." *Id.* at PID 563. After James got in the car with her son, her grandson, and Smith's son, Smith was standing next to the car. At that point, Smith pulled out a gun, aimed it at the windshield, raised it in the air, and "let off one shot." *Id.* at PID 563, 568–70. James then got out of the car, confronted Smith, and told him to leave.

After dropping the children off at school, James and Johnson reported the incident to the police. When Detroit Police Sergeant Kevin Jackson came to James's house to investigate, Smith was not at the house and Jackson did not recover the gun. However, he did find a gold Winchester Smith & Wesson .40 caliber shell casing in the driveway near where James said Smith had been standing.

Shelby Szymoniak, a forensic scientist in the Michigan State Police Firearm and Tool Mark Unit, testified that either a Glock or a Smith & Wesson could have fired the bullet, though she could not definitively rule out another type of gun because the database law-enforcement officials use for such purposes "is not all[-]inclusive." *Id.* at PID 603. And on cross-examination, she said that "a large number of firearms" could have fired the recovered casing. *Id.* at PID 609.

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Jimmie Pharr testified that the recovered casing would have had to cross state lines to end up in Michigan, as would any Glock or Smith & Wesson firearm. On cross-examination, he said he only examined the recovered shell casing and was not asked to examine a firearm.

Smith called no witnesses.

The jury convicted Smith of the felon-in-possession charge.

## C. Post-Trial

During the period for post-trial motions, Smith sent the court two letters complaining about trial counsel John Brusstar's representation, including Brusstar's decision to not subpoena Lee. The court treated Smith's letters as a request for new counsel and Brusstar moved to withdraw, citing a breakdown in the attorney-client relationship. Smith also sent the court another letter saying that he intended to file a pro se motion claiming ineffective assistance of counsel.

The district court held a hearing, granted Brusstar's motion to withdraw, and appointed Smith new counsel. The parties agreed to adjourn Smith's scheduled sentencing to allow new counsel time to investigate and possibly prepare a delayed motion for new trial, along with a sentencing memorandum. Smith's new counsel then moved for a new trial, arguing that (1) trial counsel was ineffective, (2) the district court erred when issuing a jury instruction on unanimity, and (3) the verdict was against the weight of the evidence.

Once the motion was fully briefed, the court held a limited evidentiary hearing on Brusstar's decision to not present the testimony of Charlene Lee. Brusstar testified that he was concerned that Lee's statement to Napier could raise witness-tampering issues based on Smith's contacting Lee, and that if Smith and Lee appeared to be "in cahoots," it might hurt Smith's credibility, thus harming the defense's overall credibility. R. 104, PID 1194–96. Brusstar was also concerned that Lee's statement mentioned an incident on the Fourth of July, potentially opening the door to events from the summer of 2019 when Smith allegedly tried to stab Johnson— a concern Brusstar still had after speaking with Lee on the phone.

After accepting the delayed motion for a new trial, the district court denied it on the merits. It first held that Brusstar did not provide ineffective assistance of counsel by not calling witnesses

to impeach James and Johnson, or by neither cross-examining the government's firearms expert about "ghost guns" that may resemble Glocks nor retaining a firearms expert of his own to testify about that theory, because those decisions were not unreasonable and did not prejudice Smith. R. 87, PID 1023–35. Second, it held that Smith's jury-instructions argument failed because "[t]he jury instructions as a whole accurately reflected the law." *Id.* at PID 1035–38. Finally, the district court held that Smith's weight-of-the-evidence challenge failed, in part because Szymoniak and Pharr testified credibly about the interstate-commerce nexus.

After denying the motion for a new trial, the district court sentenced Smith to 84 months in prison, followed by three years of supervised release, and a $100 special assessment.

## II. Discussion

### A. Ineffective Assistance of Counsel

On appeal, Smith first argues that Brusstar was ineffective for (1) not calling Jackson and Detroit Police Officer Monique Swartz to impeach Johnson and James with prior inconsistent statements, (2) not calling Lee to testify that she often heard gunshots from near James's house, and (3) neither cross-examining the government's witnesses about the possibility of Smith having possessed a "ghost gun" assembled within Michigan nor retaining an expert of his own to testify about that theory. Appellant's Br. at 13–19. We agree with the district court that none of these choices constitute ineffective assistance of counsel.

1.    Standard of Review

"This court typically declines to hear ineffective-assistance claims on direct appeal because the record is generally inadequate to evaluate such a claim. If the parties have adequately developed the record, however, the court can elect to hear the issue on direct appeal." *United*

*States v. Foreman*, 323 F.3d 498, 502 (6th Cir. 2003) (internal quotation marks and citation omitted).  The parties have done so here.

We review ineffective-assistance-of-counsel claims de novo, even in "the atypical context of an overarching new-trial-motion determination."  *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010).  And "[w]e review the district court's underlying factual findings for clear error."  *United States v. Kilpatrick*, 798 F.3d 365, 374 (6th Cir. 2015).  "Whether to hold an evidentiary hearing before deciding a motion for a new trial is within the discretion of the trial court."  *United States v. Bass*, 460 F.3d 830, 838 (6th Cir. 2006).

   2.     Analysis

To prevail on an ineffective-assistance claim, a defendant must show two things:  deficient performance and actual prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Deficient performance means "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  And demonstrating actual prejudice requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  When evaluating ineffective-assistance claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and "take care to avoid 'second-guessing' strategic decisions," *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689).  *See also Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("[T]he Sixth Amendment guarantees reasonable competence, not perfect litigation.").

Smith has not shown that Brusstar's decision to not call Swartz to impeach Johnson was beyond the bounds of professional norms.  According to Swartz's police report, Johnson told her that Smith had fired two shots, and that James was already in the car when Smith fired.  But

Johnson testified at trial that Smith only fired one shot, and that he fired while James was still inside the house. When Brusstar asked Johnson about those inconsistencies at trial, Johnson stuck to his trial testimony. And Brusstar again highlighted those inconsistencies in his closing argument. As the district court concluded, Brusstar "created the inference of an inconsistency rather than calling Swartz to make it explicit." R. 87, PID 1024. Such reliance on cross-examination can be a reasonable way to expose weakness in government witnesses' testimony. *Cf. Clardy v. Pounds*, 126 F.4th 1201, 1209 (6th Cir. 2025) ("Counsel, of course, must make reasonable professional efforts to expose weaknesses in eyewitness identifications . . . [, but] may use 'other means' such as cross-examination."). And the court instructed the jurors that they could draw reasonable inferences based on the evidence presented in the case.

Further, had Brusstar called Swartz, she would have corroborated Johnson's testimony that Smith fired a gun in front of James's house, and that Johnson reported the incident the day it happened. Determining whether the benefits of eliciting testimony about Johnson's inconsistent statements would have outweighed the damage from Swartz's corroborating Johnson's testimony and focusing the jury on the number of shots Smith fired was a question of trial strategy. *See Foreman*, 323 F.3d at 504 (holding that it was reasonable trial strategy to not call witnesses who could have corroborated some of the defendant's testimony but would have drawn attention to unfavorable facts and might have made the jury more skeptical of the defendant's testimony as a whole); *Bass*, 460 F.3d at 839 (holding that it was reasonable trial strategy to not impeach government witnesses' testimony using prior inconsistent statements when doing so would require counsel to dwell on a murder in which "there was an indication that [the defendant] had been involved").

The same is true of Brusstar's decision to not call Jackson to impeach James. Jackson's incident report notes that James "stated that [Smith] fired a shot at her from a firearm while she was inside of a vehicle." R. 69-5, PID 782. But James testified that Smith fired straight up in the air, not at her, and stuck to that testimony when Brusstar questioned her about it on cross-examination. Had Jackson testified, he would have corroborated the most important parts of James's testimony—that Smith had a gun and fired it in front of James and Johnson, and that James reported the incident to the police. Although another attorney might have weighed the tradeoffs of calling Jackson differently, that is not enough to put Brusstar's choice outside reasonable professional norms. *Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

Smith's argument about Brusstar's decision to not have Lee testify is similarly unpersuasive. On appeal, Smith does not contest the district court's finding that not calling Lee to testify about James's alleged statement that Marcus Smith did not have a gun—which could have risked opening the door to another violent incident between Smith and Johnson—was reasonable trial strategy. But Smith contends that not calling Lee to testify that she often heard gunshots coming from James's house was ineffective assistance.

Brusstar testified that he decided to not call Lee because he had serious concerns about her credibility, including possible inferences of witness tampering based on Smith's contacting Lee, and worried that those issues might make the jury less likely to believe the defense's narrative. Under those circumstances, not calling Lee to testify about having heard gunshots from the area of James's house is, once again, reasonable trial strategy. *See English v. Romanowski*, 602 F.3d 714, 727 (6th Cir. 2010). And Brusstar investigated Lee by speaking with her on the phone before

trial, thus providing him with information on which to base his decision. *See United States v. Six*, 600 F. App'x 346, 351 (6th Cir. 2015) (holding that it was a reasonable judgment to not further investigate a witness or call him to testify because, after a phone call, counsel determined that the witness was easily impeachable and calling him might allow the government to introduce damaging evidence).

Smith also has not shown that Brusstar's decision to not call Lee prejudiced him. Sergeant Jackson testified that there were frequently gunshots in Detroit around October 30, known as Devil's Night. Accordingly, Lee's testimony about the gunshots around James's house would "merely have repeated information that had already been placed before the jury," *White v. Mitchell*, 431 F.3d 517, 530 (6th Cir. 2005)—that someone else could have fired the recovered shell casing in James's driveway the night before the altercation in this case. Therefore, Smith has not shown a reasonable probability that calling Lee to testify would have led to a different outcome.

That leaves Smith's "ghost gun" argument. Because the parties stipulated to Smith's status as a felon and his knowledge of that status, the trial focused on whether Smith knowingly possessed a firearm and ammunition that had traveled in interstate commerce. Brusstar's defense was that the evidence did not show that Smith knowingly possessed a gun and ammunition because Johnson and James should not be believed. More specifically, he argued that Johnson and James made up an inconsistent and incredible story about Smith several years after the fact because Smith, James, and Johnson were in a love triangle. R. 64, PID 509 ("[Y]ou will hear different stories from Ronald Johnson, Yolanda James, about what happened. And why is that? Well, the mix might involve the love triangle that happened there."); R. 65, PID 666–67 ("I don't want these two paramours, Ronald Johnson and Yolanda James, making up a story four-and-a-half years later[.] . . . [T]here are so many different stories here, almost makes your head spin.")

Smith argues, however, that Brusstar was deficient for not pursuing the defense that Smith's firearm had not traveled in interstate commerce—for example, because it might have been 3D-printed or made from a kit in Michigan. But a "ghost gun" defense is inconsistent with arguing that Smith did not possess and fire a gun in the first place, so it was reasonable to pursue only one of the two defenses. *Cf. Kissner v. Palmer*, 826 F.3d 898, 903 (6th Cir. 2016) (order) ("[U]sing an insanity defense first requires the defendant to admit committing the criminal conduct. . . . [The petitioner] includes 'actual innocence' as a ground for relief in his amended habeas petition; counsel was not ineffective for failing to raise a defense Kissner himself would argue was factually wrong."). And deciding which defense to pursue and how to structure the defense is a matter of trial strategy. *Leonard v. Warden*, 846 F.3d 832, 848 (6th Cir. 2017) ("Counsels traditionally enjoy discretion over deciding which witnesses to call and how to examine them." (quotation marks and citation omitted)); *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) ("[S]trategic decisions—including whether to hire an expert—are entitled to a strong presumption of reasonableness." (quotation marks and citation omitted)).

Further, Pharr's testimony that the recovered shell casing was made outside Michigan was undisputed at trial, and all the evidence showed that Smith possessed the gun and bullet simultaneously.[1] As the district court aptly noted, "the possibility that Smith might have purchased a kit with firearm components and manufactured the gun himself in Michigan does not alter the fact that the recovered shell casing traveled in interstate commerce." R. 87, PID 1032. Smith therefore has not shown a reasonable probability that the outcome of the trial would have been

---

[1] An expert affidavit offered post-trial addressed the interstate nexus element for the firearm, explaining that identifying a gun as a bona fide Glock is "nearly impossible" when someone is holding the gun in their hands, and that many other types of guns, including "ghost guns," resemble Glocks. R. 83-2, PID 998–1000. However, that affidavit does not address whether the recovered shell casing traveled in interstate commerce.

different had counsel called an expert witness or cross-examined the government's witnesses differently.[2]

Finally, the district court did not abuse its discretion by limiting the evidentiary hearing on Smith's ineffective-assistance arguments to counsel's decision to not call Lee. It was Smith's burden to show the need for an evidentiary hearing on his other arguments. *Bass,* 460 F.3d at 838. But Smith produced no evidence other than his untimely expert affidavit to support his argument that counsel was ineffective for not calling Swartz and Jackson or pursuing the "ghost gun" defense.

## B. Jury Instructions

The district court instructed the jury that the jurors need not "be in unanimous agreement about whether the defendant knowingly possessed a firearm or ammunition as long as each of [them] [found] that he was in knowing possession of either a firearm or ammunition." R. 65, PID 683. Smith's second argument on appeal is that this instruction was reversible error because "[t]here was a 'genuine risk' that some jurors would conclude that the Defendant was guilty of possession of a firearm, but others conclude that he was guilty of possession of ammunition," Appellant's Br. at 20 (quoting *United States v. Pratt*, 704 F. App'x 420, 427 (6th Cir. 2017)), thus reaching a unanimous verdict based on different jurors believing Smith committed different acts. But there was no such genuine risk in this case.

---

[2] To support his prejudice argument, Smith cites *Coleman v. United States*, No. 4:16-CR-46, 2018 WL 1165726 (N.D. Ohio Mar. 6, 2018). But this court reversed that district court decision, holding that, because the government presented evidence that the defendant possessed a loaded gun and the defendant was charged with possessing both a firearm and ammunition, counsel's failure to challenge expert testimony establishing the interstate nexus of the firearm did not result in prejudice. *Coleman v. United States*, No. 18-3413, 2018 U.S. App. LEXIS 35812, at *3–4 (6th Cir. Dec. 19, 2018) ("[E]ven if the evidence presented did not show the firearm had traveled in interstate commerce, the same conviction would have resulted[.] . . . [A] finding that Coleman possessed the firearm would necessarily imply that he had possession of the ammunition inside of it.").

1.      Standard of Review

The parties disagree about the applicable standard of review.  Smith urges us to review the issue de novo, while the government argues for plain-error review because Smith did not renew his objection to the challenged instruction after the district court instructed the jury.  But we need not resolve this debate because Smith's claim fails under any standard of review.

2.      Analysis

"[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element."  *Richardson v. United States*, 526 U.S. 813, 817 (1999).  But such unanimity is not always required as to "which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime."  *Id.*; *see also United States v. Hendrickson*, 822 F.3d 812, 822–23 (6th Cir. 2016).

In the felon-in-possession context, "the particular firearm possessed is not an element of the crime under § 922(g), but instead the means used to satisfy the element of 'any firearm.'"  *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004).  And we have applied the same rule to cases in which a defendant was charged with possessing a firearm and ammunition together.  *United States v. Cook*, 290 F. App'x 874, 884 (6th Cir. 2008) (holding that, where a single count in the indictment charged the defendant with possessing both a firearm and ammunition, "the ammunition and weapon charged in the indictment were all located in the same single-room apartment, and the evidence sufficiently established that [the defendant] had dominion over that apartment," the district court did not err by not giving a specific unanimity instruction).

Still, a court must give a specific unanimity instruction where the facts of the case create "a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *United States v. Sims*, 975 F.2d 1225, 1241 (6th Cir. 1992) (citation and quotation marks omitted). But there is no such risk here. As the district court put it, "this case involved a discrete act at a particular time in a particular location with one gun and one shell casing." R. 87, PID 1037. Smith could not possibly have fired a gun in James's driveway, discharging a shell casing, unless he simultaneously possessed both a firearm and ammunition, either of which would independently violate § 922(g)(1) if it traveled in interstate commerce.

Smith resists this conclusion by pointing to some of the Assistant United States Attorney's (AUSA) statements during the charge conference and closing arguments, which he claims demonstrate that there was a genuine risk that different jurors would convict based on different acts. The AUSA stated during the charge conference that he had "concerns that a jury could say well, maybe we have questions about the interstate nexus of the firearm, but we don't have any issue about the ammunition." R. 64, PID 635. But the AUSA was explaining why he thought the jury instruction that the district court ended up giving was necessary, not conceding that different jurors might convict based on different acts. In the same exchange, the AUSA also said that "the ammunition and the firearm was essentially the same item," and "the law is rather clear that the jury does not have to be unanimous as to what was possessed. Firearms or ammunition or combination of either one of those." *Id.* In other words, because the government's evidence showed that Smith possessed a loaded gun on a single occasion, there was no risk that different jurors would convict based on multiple occasions when Smith possessed either a firearm or ammunition.

The AUSA's comments during closing arguments were not a concession that there was a genuine risk of different jurors convicting based on multiple acts that occurred on different occasions, either. Although the AUSA told the jury: "[Y]ou-all don't have to agree on whether he possessed a firearm or whether he possessed ammunition. . . . Half of you can think he possessed ammunition; half of you can think he possessed a firearm," R. 65, PID 663, either conclusion would necessarily be based on the same act because Smith possessed a loaded gun on a single occasion, thus simultaneously possessing a firearm and ammunition. The only potential prejudice would be if some hypothetical jurors based their guilty verdict on possession of ammunition and others on possession of the gun, and the latter group were not convinced that the gun traveled in interstate commerce. But the evidence here would not reasonably support such a hypothetical jury verdict because of the simultaneous possession of the gun and ammunition. Accordingly, neither of the exchanges to which Smith points support his argument that there was a genuine risk of different jurors convicting based on different acts.

### C. Sufficiency of the Evidence

That leaves Smith's argument that the government did not present sufficient evidence to support the interstate-nexus element of the charge. This argument also does not persuade.

1.    Standard of Review

"This Court reviews *de novo* the sufficiency of the evidence to sustain a conviction." *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009). "In reviewing the sufficiency of the evidence, the relevant inquiry is 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wallace*, 597 F.3d 794, 800 (6th Cir. 2010) (quoting *United States v. Budd,* 496 F.3d 517, 530 (6th Cir.2007)). When answering that question, the court

does not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Gunter*, 551 F.3d at 482 (citation and quotation marks omitted). And "[a]lthough specificity of grounds is not required . . . , where a Rule 29 motion is made on specific grounds, all grounds not specified are waived." *United States v. Dandy*, 998 F.2d 1344, 1356–57 (6th Cir. 1993).

2.  Analysis

The government needed to establish four elements to convict Smith. *Ward*, 957 F.3d at 696. Because the parties stipulated to Smith's status as a convicted felon and his knowledge of that status, the government needed to prove at trial only that Smith knowingly possessed a firearm and/or ammunition that had traveled in interstate commerce. *See id.* On appeal, Smith focuses on the interstate commerce element, arguing that, "[w]ithout the recovery of the alleged firearm and its examination by an expert, it is not possible to determine beyond a reasonable doubt that it has crossed the Michigan state line." Appellant's Br. at 59.

Reviewing the evidence in the light most favorable to the government, a rational jury could have found that the government proved the two elements in dispute beyond a reasonable doubt. Johnson and James testified that they saw Smith fire a gun in James's driveway. Jackson testified that, when he investigated, he recovered a shell casing in the part of the driveway where Johnson and James said Smith was standing. Although she did not definitively identify the type of gun that fired the recovered shell casing, Szymoniak testified it could have been a Glock or a Smith & Wesson. And Pharr testified that neither type of firearm was manufactured in Michigan. But more importantly, Smith does not dispute that the government presented enough evidence to support a conviction for knowingly possessing, as a convicted felon, ammunition that had traveled in

interstate commerce. Reversal is therefore unwarranted because possessing either a gun or ammunition is sufficient to sustain Smith's conviction. *Supra* Part II.B.2.

*     *     *

For the reasons set out above, we AFFIRM.